Chattanooga Machinery Co. v. Hargraves.

CHATTANOOGA MACHINERY CO. *v.* J. A. HARGRAVES.

*Knoxville.*    September Term, 1903.

1. **VERDICT.** Approved by circuit judge and sustained by any evidence, not reversed on facts.

After a verdict has met the approval of the circuit judge, the supreme court will not reverse the case upon the facts, if there is any evidence to sustain the verdict, because the supreme court can see the case on the facts only as it appears through the imperfect medium of the bill of exceptions. (*Post, p.* 484.)

Case cited and approved: Nailing v. Nailing, 2 Sneed, 631, 632.

2. **SAME.** Same. Strongest legitimate view taken of evidence in favor of verdict.

The supreme court takes as true the strongest legitimate view of the evidence in favor of the verdict, and discards all countervailing evidence, because the jury, whose exclusive province it is to pass upon the credibility of witnesses, has by its verdict resolved all conflicts in its favor. (*Post, p.* 484.)

Case cited and approved: Railroad v. Abernathy, 106 Tenn., 723, 724.

3. **SAME.** Same. Same. Complaining party must concede as true strongest legitimate view of evidence against him.

In order to impeach a verdict successfully on the ground that there was no evidence to sustain it, the complaining party must take as true the strongest legitimate view of the evidence against him, and show that it affords no support for the finding of the jury. (*Post, pp.* 484-485.)

Case cited and approved: Citizens' Rapid Transit Co. v. Seigrist, 96 Tenn., 124, 125.

Chattanooga Machinery Co. v. Hargraves.

**4.  CUSTOM OR USAGE.  As to sounding test of emery wheels; negligence not to use; liability for death from failure to use.**

Where it is shown that the sounding test of emery wheels for ascertaining defects therein is in common or very general use throughout the country by well regulated and well managed machine shops, the failure to so test such a wheel is such negligence as renders the owner and operator of such shop liable in damages for the death of his employee caused by the bursting of such wheel on account of a crack in it discoverable by such test, but not by the eye.  (*Post, pp.* 485-497.)

**5.  SAME.  As to tests is proved and inferred, how.**

Where it is shown that a large number of persons in different sections of the country are accustomed to apply a test, it is admissible for the jury, by a process of induction, to infer that the practice is in common or general use.  (*Post, p.* 495.)

**6.  SAME.  Same.  Established by knowledge or facts proved by witnesses.**

It is competent to establish the generality of a custom by the evidence of witnesses who testify from knowledge what the custom is, or by proving facts from which it may be inferred that the custom is in very general or common use throughout the country.  (*Post, pp.* 495-496.)

**7.  SAME.  Degree of diligence used by others.**

It is admissible to prove what is the degree of diligence used by business men of the same class and under the same circumstances as the party charged with negligence.  (*Post, p.* 482.)

Cases cited and approved:  Brown v. Waterman, 10 Cush., 117; Lichtenhein v. Railroad, 11 Cush., 70; Cass v. Railroad, 14 Allen, 448; Lane v. Railroad, 112 Mass., 455; Hoyt v. Jeffers, 30 Mich., 182.

**8.  SAME.  Same.  The test is general use.**

The unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business, for the stand-

ard of due care is the conduct of the average prudent man.
(*Post, pp.* 482-483.)

Case cited and approved: Kilbride v. Carbon Dioxide & Magnesia Co., 201 Pa., 552.

## FROM HAMILTON.

Appeal from Circuit Court of Hamilton County.—M. M. ALLISON, Judge.

THOMAS & THOMAS and HEAD & ANDERSON, for Chattanooga Machine Co.

PRITCHARD & SIZER, for Hargraves.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

J. A. Hargraves, as administrator of his deceased son, William A. Hargraves, brought this suit against the Chattanooga Machinery Company to recover damages for the negligent killing of his intestate.

The cause of action, as outlined in the declaration, is that the defendant company is a domestic corporation engaged in running a machine shop in the city of Chattanooga. Plaintiff's said intestate, William A. Hargraves, was a young physician, and had been pursuing a course of medical studies in a college in Chattanooga.

During vacation in 1901 said intestate determined to
seek employment of some kind, and spend his vacation in
earning wages; and, to this end, the defendant company
employed him in its shops as a helper. Among the
machines and appliances operated by defendant com-
pany in its shops is an emery wheel, which is attached
to the running gear, and is operated by the steam from
the engine and boiler. It revolves with great rapidity,
and is used for grinding, smoothing, and polishing met-
als and other substances. The diameter of this wheel
was sixteen inches, and it was about two and one-fourth
inches thick. The deceased went to work for defendant
company June 3, 1901, and among other duties assigned
him was that of grinding castings at the emery wheel.
It appears that on the fifteenth of August, about noon, a
new sixteen-inch emery wheel was substituted for an old
emery wheel, which had been reduced, by a process of
abrasion, from a diameter of sixteen inches to a diameter
of eight inches. It appears that this new wheel was
used by different employees during the remainder of that
day, and up to noon of the next day, when Hargraves
was given some castings to grind on this wheel; and,
while engaged in grinding them, the emery wheel sud-
denly burst into three pieces, one of which struck him
on the head and instantly killed him.

The first trial resulted in a verdict and judgment in
favor of the plaintiff for $5,000, which on appeal was
reversed by this court at the last term. Since then the
case has been retried, resulting again in a verdict of

$5,000 in favor of the plaintiff. The defendant appealed and has assigned errors.

On the first trial several theories were projected on behalf of the plaintiff as grounds of recovery, some of which were not sustained by any evidence whatever. The trial judge, however, in his instructions to the jury, covered all the different theories advanced tending to show liability on the part of the company. This court, in disposing of the case at the last term, through Mr. Justice Neil, wrote as follows:

"The present case is very peculiar in the wide scope which the declaration took, and the equally wide scope of the inquiry in the evidence. The plaintiff evidently had no clear idea in the beginning as to what was the cause of the accident, and so alleges many theories, as he had a right to do, which he did not subsequently prove —things which he inquired about in the testimony, and endeavored to prove, but did not succeed in getting any evidence to establish. Practically, the only point established, after showing the employment; that the deceased was working at the wheel at the time of his death. and was killed there by the explosion of the wheel—was that there was evidence tending to show that there was a crack in the wheel; that this crack, if there at all. was not open to outward observation before the wheel burst; that it might have been discovered, if present at all, by what is known as the 'sounding test'; that this sounding test was not used by the defendant, or known to the defendant, but that it was an ordinary test applicable to

vitrified emery wheels, as shown, probably, by the testimony of Mr. Dillar, the manufacturer; and that the crack in the wheel, if present at all, made it dangerous, and probably caused the explosion."

Again it was said: "The court finds the proof upon the subject of the crack in the wheel (the only ground upon which the verdict could, in any event, stand) of the very narrowest kind; that is to say, while the existence of the crack is made fairly probable by the testimony of the witness Connor, and the fact that the wheel could have been cracked in transit from the factory, or in the shop, yet it is shown that the crack was not open to observation from the outside, and could only have been detected by the sounding test; and the only proof supporting the position that the sounding test should have been applied by defendant, as an ordinary test, is that of Mr. Dillar, to the effect that it would have been negligent in the purchaser not to sound the wheel before putting it on the mandrel. From this testimony the jury was authorized to infer that it was an ordinary test. . . . Under the rule of law applicable to the subject, the defendant would not be bound to apply a test not in ordinary use. In view, therefore, of the exceedingly narrow ground upon which the liability as to the alleged crack must rest (with the testimony), and the very great probability that the jury were confused by the instruction of the circuit judge upon points not covered by the testimony, we are of the opinion that the judgment

should be reversed, and the cause remanded for a new trial."

On the last trial, in accordance with the opinion pronounced by this court, all extraneous issues were discarded, and the utility of the sounding test, and whether or not it was in common use, was made the storm center of the case. In elucidation of that issue, much testimony was introduced by both sides. The trial, as already stated, resulted adversely to the contention of the company, and its first assignment is that there is no evidence to support the verdict; and, since this assignment presents the real controversy in the case, we will proceed at once to its consideration.

Says Mr. Wharton in his work on Negligence, section 46: "It is admissible for a party charged with negligence to prove what was the degree of diligence used by other business men of the same class under similar circumstances." *Brown* v. *Waterman,* 10 Cush., 117; *Lichtenhein* v. *Boston & P. R. Co.,* 11 Cush., 70; *Cass* v. *Railroad,* 14 Allen, 448; *Lane* v. *Railroad,* 112 Mass., 455; *Hoyt* v. *Jeffers,* 30 Mich., 182. As said by the supreme court of Pennsylvania in *Kilbride* v. *Carbon Dioxide & Magnesia Co.,* 201 Pa., 552, 51 Atl., 347, 88 Am. St. Rep., 829. "It is not negligence because a particular accident might have been prevented by some special device or application not in common use. . . . It is not enough that some people regard it as a valuable safeguard. The test is general use. . . . The unbending test of negligence in methods, machinery, and

appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man."

It may be conceded that no evidence was introduced on the last trial sufficient to sustain a verdict against the defendant company, unless it is found in the evidence tending to show that there was a fracture in the emery wheel, which caused it to burst under rapid revolutions, and that this fracture could have been discovered by the application of the sounding test, and that said test was in common use at the time.

It is conceded on the brief of learned counsel for defendant that there is evidence in the record from which a jury could properly find that the wheel was cracked at the time it was adjusted on the mandrel. It is established by the evidence that this fracture was not discoverable by a superficial examination with the naked eye. The theory of the plaintiff is that this fracture occurred after the wheel left the hands of the manufacturer, either in the course of transportation, or by rough handling after it came into the hands of the defendant company. It is claimed on behalf of plaintiff that the fracture could have been discovered by the application of the sounding test, and it is conceded that no such test was made.

It is further insisted on behalf of plaintiff that this sounding test was in general use in well-regulated machine shops, and was practiced by experienced and pru-

dent machinists.   Hence it was an act of negligence for the defendant company to attach this wheel to the mandrel without subjecting it to the sounding test.

In overruling a motion for a new trial, the circuit judge said:

"To my mind, the proof shows that the emery wheel was a cracked and defective wheel.   There is proof that the sounding or hammering test, if applied, would detect a crack, if one existed.   It is possibly true that the weight of the testimony shows that this sounding test was not in common or ordinary use in the city of Chattanooga, but, in my opinion, the preponderance of the evidence shows that generally throughout the country it was the usual test, and in common and ordinary use by the operators of emery wheels."

While the circuit judge found that a preponderance of the evidence sustained the theory of the plaintiff that the sounding test was in general use, it is only necessary, under the established practice in this court, to find that the theory is sustained by some material evidence.  After a verdict has met the approval of the circuit judge, this court will not reverse, if there is any evidence to sustain it.   This court takes as true the strongest legitimate view of the testimony in favor of plaintiff, and discards all contervailing testimony, because the jury, whose exclusive province it is to pass upon the credibility of witnesses, has by its verdict resolved all conflicts in his favor.  *Railroad* v, *Abernathey*, 106 Tenn., 723, 724, 64 S. W., 3.  And in order to impeach it successfully on the

ground that there was no evidence to sustain it, the complaining party must take as true the strongest legitimate view of the testimony against him, and show that it affords no support for the finding of the jury. *Citizens' Rapid Transit Co.* v. *Seigrist,* 96 Tenn., 124, 125, 33 S. W., 920.   The reason of this is obvious. This court can see the case only as it appears through the imperfect medium of the bill of exceptions. The evidence is often not fully stated, or inaccurately stated. The manner, intelligence, and credit of the witnesses are of necessity obscurely and imperfectly represented, and, in considering the merits of the verdict, this court will hesitate to pronounce against the opinion of the judge who tried the cause.   *Nailing* v. *Nailing,* 2 Sneed, 631, 632.

Plaintiff, for the purpose of showing that this wheel was not cracked when it left the hands of the manufacturer, read the depositions of the manager and general superintendent of the manufacturing company, which had been taken on behalf of the defendant company, but which the latter declined to read.   These witnesses explain the process of manufacturing vitrified wheels, and testify in respect of the care exercised by the company in testing its product before it leaves the factory. The company employs in its manufacture what is known as the "vitrified process."   The wheels are made by mixing emery with clay and certain chemicals.   The wheels are first subject to degrees of pressure varying from one hundred tons' down, determined by the size of the wheel, and are then tested by the superintendent, to be sure

that the mixing is thorough.    Next the wheels are put
in kilns, and subjected to intense heat.    They are then
taken out of the kilns, and a second thorough examina-
tion is made, to determine whether the burning has been
thorough.    The wheels are then trued up, turned, burn-
ished, and made ready for shipment.    Another inspec-
tion is then made by the superintendent, and the wheel
placed in a speed machine, and, if it be a sixteen-inch
wheel, it is caused to revolve 1,500 revolutions per
minute.

Now, according to the testimony of the manager and
superintendent of the manufacturing company, this
wheel was subjected to all these tests before leaving the
factory, and no fracture or other defect in its construc-
tion was discovered.    There is testimony tending to show
that, before the wheel was put on the mandrel, it was
examined with the naked eye, and no defect in it was
discovered.    Mr. Dillar, the manager of the manufac-
turing company, testifies:    "If a wheel has the slightest
crack in it, if you sound it the ear will hear what the eye
cannot see."    He was then asked the following question:
"Then the supreme test by which you determine whether
or not a crack exists in the body of the wheel, and ren-
ders it dangerous, is by sounding it?    Answer, Yes; by
sounding it, which will detect the minutest crack in it,
which is entirely impossible to see with the naked eye."
Mr. Collum, the superintendent of the manufacturing
company, was asked:

"Q. Is it easy or difficult to detect a small crack in an emery wheel?

"A. It is very easy.

"Q. How is it done?

"A. The testing is done by striking it."

According to these witnesses, this sounding test should be applied before the purchaser places the wheel on the mandrel, in order to ascertain whether it has been injured since leaving the manufacturer, in its loading or unloading or transportation, or while lying in the shops awaiting use.    According to these witnesses, a wheel may receive a crack after leaving the manufacturer.

It appears from the proof that three or four other wheels were embraced in the order for this wheel sent by the Chattanooga Machinery Company to the Peerless Machinery Company.    The entire lot was shipped in the same box. When they were received, they were unpacked and deposited on the workbench.    It appears that there were shelves in the toolroom of the defendant company, and it had been the practice to place all emery wheels on these shelves for their protection against injury.    When this consignment of wheels was received, there was no room on the shelves, and hence the wheels were placed on the workbench, where they remained until they were brought into requisition.    This particular wheel was taken from the workbench, and attached to the mandrel, without subjecting it to any test, except a superficial examination with the naked eye.    As already stated, it burst within twenty-four hours after it was put on the

mandrel, resulting in the death of the plaintiff's intestate. The witness Connor says that he happened to be in the building when the explosion occurred, and carefully examined a piece of the broken wheel. He testifies: "The best of my knowledge is that about two and one-half inches from the eye there was a crack; looked to be a shrinkage crack. The crack was in the shape of the letter 'S,' but the wheel was cracked at the eye. It may have been done in unpacking it, or in some other way."

His testimony is that this fracture could not have been discovered by a superficial examination with the eye. He claims to have detected the crack from the fact that the wheel had been lying where there was oil, and the oil had been absorbed into the wheel clear through the crack. The crack was on both sides of the wheel, and extended through the wheel, and ran down into the eye of the wheel. According to the witness, a shrinkage crack is one that occurs under heat, when the wheel is being baked. It is claimed that this crack had occurred in the manufacture, and could not be detected by the naked eye. One of the wheels that came in the consignment with the wheel that afterwards exploded also had a crack in it, which was discovered by the naked eye, and returned to the manufacturer as unsound. This defective wheel was not discovered until after the explosion of the wheel resulting in the death of plaintiff's intestate. It was immediately shipped to the manufacturer without ever having been used.

But the cardinal and crucial inquiry in this case is

whether there is any evidence to support the verdict that the sounding test was in common use by well-regulated shops. This inquiry necessitates a review of the evidence on this subject submitted on behalf of defendant in error.

A. P. Scanlan, introduced by plaintiff, testified that he had been a machinist since 1867, and had worked in a number of well-regulated shops. He was asked:

"Q. Mr. Scanlan, is there a test of any kind, called the sounding or hammering test, for emery wheels?

"A. The sounding test; yes, sir.

"Q. Now, I wish you would explain that to this jury. Please, in your own way, tell what it means, and why it is applied?

"A. Well, there are different methods of applying it, but my mode of applying it to a wheel is to suspend the wheel in the most practical manner, and then sound it by rapping on it with a hammer, or any other object that will make a sound; and then I am governed by the sound or ring of the wheel, as to whether it is cracked or not. Sometimes a crack may exist, and not be perceptible to the eye. A wheel may be partly fractured, while it is otherwise in perfect order; but by this sounding test you can discover that, while otherwise you might not be able to do so. Frequently there are cracks in emery wheels, that cannot be seen by the naked eye, that can be discovered by this hammer test. This test is usually applied before the wheel is put on the arbor of the machine. I don't know whether it is part of the test that is used

by the manufacturers or not. I am not positively certain about that, but I know it is used by me. I have been applying the hammer or ring test for twenty-two or twenty-three years; in fact, ever since I have been handling emery wheels, or putting them in machines. I generally hang the wheel up, so that I can get the sound—so that it will ring clear. I use a hammer, or piece of metal, or anything, so that I can get the sound or ring from the wheel. If the wheel is not cracked, it will give a good, clear, sound; and, if it is, it will give a peculiar sound, entirely different."

The witness further testified that, in three or four instances, by the use of the sounding test he had discovered cracks in the wheels that were not visible to the naked eye. The witness was then asked the following question:

"Q. Now, from your observation and experience as a machinist covering this period of service which you have mentioned, is this hammer or sounding test customary and usual in all well-regulated and well-managed machine shops?

"A. I cannot answer that question positively. It has always been the test I have used. I presume it is."

Counsel for the defendant objected to the witness testifying as to his experience and on presumption. The court sustained the objection for the present. He was further asked this question:

"Q. I'm not speaking about what they do in some particular shop, but I'm asking you if that manner of test-

ing a wheel is customary and in general use in well man-aged and well regulated shops?

"A. I have seen it done often.

"Q. In all these shops you have mentioned?

"A. Yes; I have seen it in some shops I have worked in, and in some they didn't use it; but I say that, when-ever I am putting on a wheel, I always give it the ham-mer test. I always tried to apply that hammer or sounding test before they are put on. Often I have seen wheels when they were taken off, and I have applied the hammer test, and put it back on."

This witness was further asked:

"Q. What are the different things that are liable to cause a wheel to burst?

"A. Well, there are several causes that will cause a wheel to burst. One is to crowd the wheel too close; that is, to crowd something on the wheel between the wheel and the vest. Another is to have the wheel too tight on the mandrel. Another is to allow it to be too loose, so it can slip about. Another is, the wheel may be clamped too tight; that is, this washer that fits on there next to the wheel may clamp it too tight. Any of those defects I have mentioned may cause the wheel to burst."

On cross-examination the witness was asked if it is not a fact that the sounding test is in common or gen-eral use.

"A. I say that it has been in general use a great deal

where I have worked, and I have seen it done for a number of years."

Again he said: "I don't say it is in general use throughout the country, because I have not worked in all the shops."

A. W. Rivette was asked:

"Q. When is this sounding test applied in reference to putting a wheel on the mandrel preparatory to operating it?

"A. Well, the foreman, or man putting it on, is the man that should make the test himself.

"Q. Now, Mr. Rivette, is the sounding test or hammer test a customary or usual test in well regulated and well managed machine shops?

"A. In all shops where I have ever been employed, I have always used that test. When I have been employed in any large concern, they have always had an experienced foreman in charge of the shops, and that test has always been applied.

"Q. Do you know of any well managed or well regulated machine shops that do not use that sounding test?

"A. Well, I can't say that all machine shops use that test.

"Q. I mean all well managed and well regulated machine shops?

"A. Well, that is a question I cannot answer, for the reason that I do not know what tests other machine shops or other men may have applied for determining about a wheel; but, in all the shops in the North and

East where I have been employed, they have always used that test."

W. H. Rogers, who has been a machinist for forty years, testifies:

"I have used that sounding test for years on every emery wheel I have used.

"Q. Is that sounding or hammer test a customary or usual test in well managed and well regulated shops?

"A. I always do it, but don't know whether it is a fact or not."

Counsel for defendant objected to the witness testifying to what he had done. Objection sustained by the court.

W. A. Fergus, who has been a machinist for thirty-five years, testifies:

"Well, I usually test a wheel before I put it on; examine it for any cracks, to see whether or not it is solid. I usually do that by suspending it, and then tapping it with some heavy instrument, and listen to the sound.

"Q. Do you know whether the sounding test or the hammer test is the test that is ordinarily used in well regulated and well managed machine shops where emery wheels are used?

"A. Well, to some extent it is. In some instances there might be defects that might require something else.

"Q. Is it not generally used?

"A. Yes; as far as I have noticed.

"Q. Does that extend to all you have noticed?

"A. Yes, sir."

August Lieneweber.   Witness was asked:

"Q. From your experience in well managed and well regulated machine shops, is this sounding test one that is usually applied to an emery wheel?

"A. I would not pick up that wheel and use it— I would not put it on and use it without testing it.   Yes; I test the wheel before I put it on the mandrel.   You can't tell a good wheel by looking at it.   So you have got to try it and test it before you put it on.

"Q. Is that test applied frequently by men employed in machine shops?

"A. Well, in my own shops.   I don't know.   I see so many of them use it; but I have used it in all the shops I have been dealing with, and whenever I put wheels on.

"Q. Is it not a fact that this test is the one in use in those shops where you have been and where you have worked as a machinist?

"A. Yes, sir.

"Q. Do you know of any shops where it is not used?

"A. I do not know.   I never worked in all the shops here in town, but in two of the shops here I know that every emery wheel that I put on I test it that way.   I was the toolmaker, and when I put them on I test them in that way, and also test them to see if they were true."

Gus Krause:   " I always apply the sounding test."

A. C. Jeffrey:

"Q. Now, I will ask you, Mr. Jeffrey, whether it is customary, in shops in which you have worked, to apply

Chattanooga Machinery Co. v. Hargraves.

that sounding test to emery wheels before putting them on the mandrels and using them?

"A. Yes; they always do that before they put them on.

"Q. What is the purpose of that test, Mr. Jeffrey?

"A. To find whether they were defective, or not, in any way."

George W. Morgan. Witness says: "I could not state for all shops, but I have seen shops where they did test wheels in that way. I have tried that test myself, and it always discloses the crack or imperfection of the wheel."

We are constrained to believe, from this review of the plaintiff's testimony, there is material evidence to support his theory that this sounding test was in very general use throughout the country, or at least sufficient evidence from which a jury might legitimately infer there was such a test in common use.

While it is impossible, in the nature of things, for witnesses to testify of their own knowledge that a majority of those engaged in the business practice a particular test, yet, where it is shown that a large number of persons in different sections of the country are accustomed to apply that test, it is admissible for the jury, by a process of induction, to infer that the practice is in common or general use. It is competent to establish the generality of a custom by the evidence of witnesses who testify from knowledge what the custom is, or by proving facts from which it may be inferred that the

custom is in very general or common use throughout
the country.   We think, upon the testimony offered in
this case, the jury were well warranted in inferring that
the sounding test was in very general use throughout
the country, although the evidence fell short of estab-
lishing affirmatively that a majority of those engaged in
the business actually practiced the test.

It is insisted on behalf of the plaintiff in error that
the utter worthlessness of the sounding test to discover
fractures in an emery wheel which are not discernible
to the naked eye was demonstrated on the trial by cer-
tain experiments made by expert witnesses.   One of the
wheels so submitted to the expert witnesses was a
cracked wheel, which had been obtained by defendant
company from the manufacturer to be used in making
this test.   It is insisted that every one of plaintiff's ex-
pert witnesses, without hesitation, pronounced this a
sound wheel.   Counsel for defendant in error insisted
that this test was unfair, for the reason that this cracked
wheel had received its fracture before it was subjected
to the heat process, and was afterwards baked.   The in-
sistence is that it was not a wheel which had received
its crack after it had been manufactured, but that the
crack had been baked in the wheel.   It is insisted that
the parts being melted together again by intense heat,
and vitrified, would restore the sound.   The evidence
establishes that this wheel used in the test was cracked
when they put the wheel back and baked it.   In other
words, it was an old crack, and afterwards baked into

Chattanooga Machinery Co. v. Hargraves.

the wheel. It was not a crack in the wheel which resulted from usage. It is probably true, as insisted by counsel for defendant in error, that a fairer test of the utility and efficiency of the sounding test would have been its application to a wheel which had received a fracture after its manufacture. However, these experiments were made under the observation of the jury, and doubtless were given due weight in the consideration of the case.

This disposes of the main question presented on the assignment in this court. The remaining assignments of error have all been considered, but no reversible error found. Affirmed.