NASHVILLE GAS & HEATING CO. v. PHILLIPS.—69 S. W. (2d) 914.

Middle Section. November 10, 1933.

Petition for Certiorari denied by Supreme Court, March 31, 1934.

Price, Schlater & Price, of Nashville, for plaintiff in error.
Walker & Hooker, of Nashville, for defendant in error.

FAW, P. J. This is an appeal in the nature of a writ of error by the Nashville Gas & Heating Company, defendant below and hereinafter called defendant, from a judgment for $8,000 and costs against it and in favor of Grady Phillips, plaintiff below and hereinafter called plaintiff.

In the circuit court the plaintiff sued for $20,000 as damages for personal injuries suffered by him as the result of alleged negligence of the defendant.

It is averred in plaintiff's declaration (filed July 29, 1931) that the defendant is, and was on January 15, 1927, a corporation organized and doing business under the laws of the state of Tennessee, with its principal office and place of business in the city of Nashville, Davidson county, Tennessee, and engaged in the sale and distribution of gas throughout the city of Nashville and vicinity, and for the purpose aforesaid defendant constructed, owned, and maintained a certain gas line which was laid in Fourth Avenue South, within the corporate limits of the city of Nashville, Tennessee; that, on January 15, 1927, plaintiff was employed at a Gulf filling station located on Fourth Avenue South, and while in the discharge of his duties it was necessary for him to enter a small room or closet to change his clothes after his day's work, preparatory to leaving his place of employment, and while in said stock room or closet the plaintiff was rendered unconscious and fell violently to the floor in his unconscious condition, from which fall he sustained a severe fracture of the base of the skull, as a result of which he underwent great pain and mental anguish and incurred large doctor's bills and hosptial bills.

The above-stated averments of plaintiff's declaration are amply sustained by the proof and are not now disputed.

It is further averred in the declaration that plaintiff was rendered unconscious as the direct and proximate result of the negligence and carelessness of the defendant in permitting gas to escape from its main, by reason of a leak or defect, so that said gas found its way along the water main and into the stock room or closet in which plaintiff was rendered unconscious, etc.

Defendant pleaded the general issue and the case was tried to a jury. Motions for a directed verdict on behalf of defendant were

made and overruled at the close of plaintiff's evidence and again at the close of all the evidence, and the jury found the issues in favor of the plaintiff and assessed his damages at $8,000, and judgment of the court was rendered accordingly for the amount of the verdict and for all the costs of the cause.

Defendant's motion for a new trial, seasonably made, was overruled, and thereupon defendant excepted to the action of the court in overruling its said motion and prayed an appeal in the nature of a writ of error to this court, which was granted by the trial court and perfected by the defendant.

In this court the defendant has filed twenty assignments of error, all relating to matters presented to the trial court in the motion for a new trial; but the assignments numbered three (that the verdict is contrary to the preponderance of the evidence), four (that the evidence preponderates against the verdict), five (that the verdict of the jury is contrary to the charge of the court), and seven (that the trial court erred in not granting defendant's motion for a directed verdict at the close of the plaintiff's proof) are all overruled, for the reason that they do not present questions which this court can consider. Illinois Central R. Co. v. Abernathey, 106 Tenn., 722, 728, 64 S. W., 3; Felton v. Clarkson, 103 Tenn., 457, 53 S. W., 733.

After its motion for a directed verdict at the close of plaintiff's evidence was overruled, defendant introduced and examined witnesses in its own behalf, and thereby waived its motion made at that time. Tenn. Central Railway Co. v. Zearing, 2 Tenn. App., 451, 454.

Defendant's first assignment is that "the trial court erred in refusing to grant defendant's motion for a new trial and to set aside the verdict in this cause, and to direct a verdict in favor of the defendant and to dismiss the plaintiff's suit."

The second assignment is that "the trial court erred in not holding that there is no evidence to support the verdict."

The eighth assignment is that "the trial court erred in not granting the defendant's motion for peremptory instructions or a directed verdict at the conclusion of all the evidence."

In view of the first, second, and eighth assignments of error, supra, we have carefully examined all of the evidence admitted by the trial court, for, in the disposition of these three assignments, it is our duty to take into consideration the evidence on behalf of the plaintiff and such parts of the evidence introduced on behalf of the defendant as are not in conflict with the evidence for the plaintiff (Martin v. Braid Electric Co., 9 Tenn. App., 542, 558), disregarding all of the defendant's evidence that is contradicted by or inconsistent with the evidence for the plaintiff. Walton & Co. v. Burchel, 121 Tenn., 715, 723, 121 S. W., 391, 130 Am. St. Rep., 788;

Chattanooga Machinery Co. v. Hargraves, 111 Tenn., 476, 484, 78 S. W., 105.

At the time the plaintiff, Grady Phillips, was injured as before stated, he was employed by the Gulf Refining Company as a service station attendant at its filling station situated at the northeast corner of Fourth avenue South and Molloy street in the city of Nashville. The general direction of Fourth avenue is north and south, and Molloy street enters it from the east, but does not extend further westward.

The Gulf filling station at which plaintiff was employed as aforesaid (to which we will refer as the filling station, or the station) fronted west on the east side of Fourth Avenue South, with a shed in front, under which shed gasoline pumps, etc., were located, and on the east side there was a narrow building, built of brick, extending across the width of the shed from north to south, which was divided, by partitions, into three compartments, viz., an ''office,'' a ''stock room'' (frequently called a ''locker room''), and a ''gentleman's toilet.'' The stock room and gentleman's toilet, both very small rooms, occupied the south end of the building, with no opening in the partition between them. The remainder of the inclosed building was used as an office, from which separate doors opened into the stock room and the toilet, respectively. There was a door in the front or west side of the office opening into the shed, windows in the front of the office, a window in the north end of the office, and a window in the stock room and toilet, respectively. The office was equipped with desks, a telephone, and some office furniture, and was heated by means of a small coal stove situated in the north end.

In the stock room there was an ''air compressor,'' or ''air pressure plant,'' used for the purpose of inflating automobile tires, which was operated by electricity, some steel cans of oil, some cup grease, and two steel lockers, each having an upper and lower compartment, used for storing clothing of the attendants, and a water cut-off used for the purpose of cutting off the water from the filling station when desired.

There were no pipes, or sewer connections, or plumbing fixtures of any kind in the stock room, other than the above mentioned water cut-off, which was located in the southwest corner between the lockers and the west wall, and which consisted of a steel rod fitted loosely inside a galvanized pipe which acted as a sleeve or conduit for the rod. The toilet and two hydrants—one at the north side of the building and one near the southwest corner—were supplied with water piped in from a city water main about 3 feet underground on the west side of Fourth avenue. The water meter for the station was located in the east sidewalk of Fourth avenue, a short distance

north of the station building but in front of the "runway" on the station lot.

There was a street car track (and only one) on Fourth avenue in front of the station, and it was located nearer the west than the east side of the street. The city water main was west of the street car track, and a 6-inch gas main of the defendant was east of the street car track, but the station was not supplied with illuminating gas, and there were no gas pipes or gas fixtures of any kind in the station building. There were gas service pipes extending from the gas main to the sidewalk in front of the filling station which had been installed by defendant gas company at the time Fourth Avenue South was paved with concrete, overlaid with brick, in the year of 1914 or 1915. These gas service pipes were installed by defendant in obedience to a section of defendant's franchise granted by ordinance of the city of Nashville, which provided "that, hereafter, whenever the City paves with granite, brick, asphalt or other permanent material, any street in the City in which the Company has its mains, it shall be the duty of said Company, before said work is done, to run in service pipes from its main pipes to the sidewalk of each and every lot, no matter whether such lot is vacant or improved."

However, it is not claimed that these gas service pipes, extending from the main to the sidewalk, contributed in any way to plaintiff's injuries. It is the theory of the plaintiff that gas escaped through a "break" in defendant's main and followed the service water pipe (which crossed defendant's main near the "break") into the stock room, through the water cut-off.

At the time the gas service pipes were installed in 1914 or 1915, all of defendant's gas mains in the territory here involved were exposed and carefully examined. Each joint was calked and tested, and the main was put in "first class shape."

There was an underground city sewer in that part of Fourth avenue adjacent to the filling station and under the concrete runway on the north side of the station, and a pipe from the toilet in the station building led into this sewer.

In the neighborhood of the filling station, there were several laundries which used chlorine, an asphyxiating gas, in their cleaning process, which was discharged into the aforementioned sewer. It is in proof that chlorine gas is a "toxic gas," and affects the lungs—the respiratory system. V. H. Allenbach, service station superintendent for the Gulf Refining Company at Nashville in January, 1927, whose deposition was taken by plaintiff but read on behalf of defendant, and who assisted in removing plaintiff from the stockroom, testified that, at that time, "near the store room door there was a nauseating odor" that "smelled like chlorine gas."

During late December, 1926, and early January, 1927, there was

an unprecedented flood in the Cumberland river, which reached its crest on January 1, 1927, when it measured 56.1 feet on the gauge at Nashville. The Gulf filling station in question and the surrounding territory were overflowed and submerged by the flood waters to a depth of several feet—variously estimated by the witnesses from 4 to 10 feet. The flood waters covered practically 12 miles of defendant's gas mains in the city of Nashville.

The filling station in question was "put out of business" by the flood on December 24, 1926, and was closed until January 8, 1927, when it was reopened by employees of the Gulf Refining Company, who then set to work to clean up the building and premises, and in two or three days they were thoroughly cleaned and business was resumed as usual—in fact, sales of gasoline, oil, etc., were made at the station on and after January 8th. The weather was cold and the office was heated by the coal stove therein on and after January 8th.

Plaintiff, Grady Phillips, began work at the filling station as a "service station attendant" on January 11, 1927, four days before he suffered the injuries for which he sued in this case. This was his first employment at a filling station. He was then twenty-three years of age. He had been reared on a farm in Davidson county and had never lived or worked in a building where illuminating gas was used. He had had no experience whatever with illuminating gas and was not familiar with its odor.

Plaintiff's hours of employment were from 6 A. M. until 7 P. M., except on Saturdays, when he worked one hour later—until 8 P. M. The station was not open for business on Sundays. Saturday, January 15, 1927, was a very cold day. The temperature chart of the U. S. Weather Bureau at Nashville is in evidence, and shows that the minimum temperature on that day was three degrees and the maximum temperature was nineteen degrees, Fahrenheit. On that day, two other employees of the Gulf Refining Company, viz., Howard S. Wright, the service station manager, and Buist Wehrenberger, a service station attendant, were on duty at the station in question with plaintiff.

Referring to the day on which plaintiff was injured, Wright testified that he developed "a severe headache," beginning in the morning, and in the afternoon he became "very dizzy" and "couldn't stand up hardly;" that every time he went out in the fresh air he felt like some one "hit him in the head;" that he became so ill he had to go home at 5 o'clock in the afternoon; that he got some one to crank his automobile for him before leaving the station, and, although he drove to his home, he did not remember anything after he left the station until he was at home in bed.

Plaintiff testified that he did not notice anything wrong inside the filling station on Saturday, or at any time prior thereto, but in

the afternoon he took "an awful headache," which came on "gradually" and he first noticed it about 2 o'clock.

Plaintiff further testified that, about fifteen mniutes before 8 o'clock in the evening, he went into the office and thence into the stock room to take off his uniform and put on his street clothes; that he closed the stock room door behind him; that it was cold in the stock room; that he had removed his uniform and his shoes that he "worked in," and had put on his trousers but not his "best shoes," when he became unconscious, and did not remember anything else until he "woke up" in the Protestant Hospital; that he was standing about 3 feet from the water cut-off when he lost consciousness; and that he did not at any time notice any "peculiar odor" in the stock room.

At the time plaintiff went into the stock room, Buist Wehrenberger was the only person, other than plaintiff, in the station. Wehrenberger was at that time seated at a desk, on which there was a telephone, in the office.

Wehrenberger testified that he had been in and out of the office during the day, and that night he began to feel "dizzy" and suffer with his head; that he was seated at a desk in the office and heard Grady Phillips (the plaintiff) call him from the stock room and he attempted to "go to see what he wanted," but fell to the floor; that about that time the phone rang and he got back into the chair and "started to answer" and remembered nothing more until about 6 o'clock next morning, when he regained consciousness at his home.

At the time plaintiff and Wehrenberger became unconscious, all the openings into the office, stock room, and toilet were closed, except a transom over the front door of the office, which was open.

Plaintiff's witness H. F. Lamb testified that, on the night of the occurrence here under investigation, he drove his automobile under the shed of the Gulf filling station at the corner of Fourth avenue and Molloy street to get some gasoline; that the station lights were on in the office and on the outside; that no one came out to serve him, and after waiting about three minutes, he got out of his car and went into the "front office" where he found Wehrenberger lying on the floor, unconscious; that about the time witness walked into the office, "some fellow drove up" who told witness that he was the superintendent, and that they (witness and the superintendent) "pulled this man (Wehrenberger) to the outside;" that while witness was in the office his attention was attracted to "somebody kicking on the door" of the stock room, and he opened the door and found the plaintiff "lying there about half dead;" that they took plaintiff outside to give him some fresh air; that plaintiff was "black practically," and was jerking like a man having convulsions, and was "mumbling," but witness could not understand

what he was saying; that "the Superintendent" called a doctor, but witness had an appointment to fill and left before the doctor arrived.

The witness Lamb also testified that he lived in Nashville and had been using defendant's gas for cooking and heating water for several years and "knew gas" when he "smelled it;" that when·he opened the door and walked into the station he smelled gas just like he had in his home, and when he opened the door to the stock room where he found plaintiff, he smelled "the same thing" in "the same degree;" that he did not "smell anything on the outside at all," and did not smell any sewer odor that night.

It appears from the testimony of Dr. Ray C. Bunch, a graduate physician of sixteen years' experience, the major part of which had been in the city of Nashville, that he was called to the Gulf filling station at the corner of Fourth avenue and Molloy street about 7:30 or 8 o'clock in the evening of January 15, 1927, and found the plaintiff lying under the shed, outside the office and "very ill;" that plaintiff was unconscious, breathing heavily, and discolored; that he was "blue;" that witness called an ambulance and sent plaintiff to the Protestant Hospital, where witness later discovered that plaintiff had "sustained a fracture at the base of the skull;" that in order to call the ambulance, he (Dr. Bunch) went to the telephone in the office at the filling station and while in the office he smelled what he "took to be gas"—"just the ordinary illuminating gas;" that he has had opportunities to know the smell of gas—has it in his home—and that gas makes him very sick, gives him a headache almost instantly, and that when he went into the office at the filling station on the occasion under investigation, it gave him a headache.

Dr. Bunch testified further that plaintiff's symptoms at the time he attended him at the filling station as aforestated justified the conclusion that plaintiff had been asphyxiated; that his "body was black," he was "practically pulseless," and "he had all the classic symptoms of asphyxiation;" but Dr. Bunch said, on cross-examination, that it was "possible" that the symptoms thus described "might have resulted from this fracture at the base of the brain."

The filling station was not opened for business on Sunday or Monday following the Saturday on which plaintiff was injured. H. S. Wright, the station manager, visited the station on Monday and made some investigation of the premises and smelled gas in the city water meter at the edge of the sidewalk in front of the station and also in the office. Buist Wehrenberger returned to the station on Tuesday morning, and at that time he likewise smelled gas in the water meter and in the office.

Wright, who was also at the station Tuesday morning, called the "Trouble Department" of defendant gas company on that morning, and in about fifteen minutes thereafter, A. M. Blackford, defendant's "complaint man" (whose duty it was "to investigate com-

plaints'') reached the station and made an examination of the premises.

"Blackford testified (as a witness for defendant) that, at the time above mentioned, he smelled "the Company's gas" in the water meter and in the office and stock room, and concluded there was a leak in the defendant's gas main; that he thereupon called the office and had men come down there to repair the leak. The "crew" who thus responded to Blackford's call consisted of five men, viz.: W. F. Stone (general foreman), Clarence Upton (assistant to the general foreman), P. A. McGovern, Sam McGill, and Harvey Bradbury. Stone and Upton died before the trial of this case below, but McGovern, McGill, and Bradbury testified, as witnesses for defendant, at the trial.

By means of an "air drill," or "air compressor drill," defendant's crew drilled five holes through the brick and concrete paving, at intervals of about 20 feet, along and over the line of defendant's gas main in front of the filling station and that vicinity, and by driving down a "bar" in each of these holes, extended the hole downward through the earth to the gas main, and by "smelling" at these holes, detected the odor of gas in one of these holes opposite the aforementioned water meter, and made an opening or excavation in the street at that point down to the gas main and found a "fresh break," or "new break," in the main, from which "break" gas was escaping. Upon finding this "break," defendant's employees immediately repaired it by putting "soap around it," wrapping it with "waxed linen," and putting a "sleeve" on it, which "sleeve" is described as "two half-circles like a pipe, but folded together," with flanges on each side through which the half circles were bolted together and drawn tight. The proof is that this method of repairing the pipe is "the accepted standard approved method in matters of that kind" and made the pipe "stronger" than it was before the "break."

After the above-mentioned "break" in defendant's gas main was repaired as aforesaid, the odor of gas promptly and permanently disappeared from the water meter and the filling station, and there was no further appearance of illuminating gas or gaseous odors in the station.

Defendant's gas main consisted of half inch cast iron pipe, 6 inches in diameter, and constructed in sections 12 feet long. It did not break at a joint between sections, but about the middle of a section, and there is ample proof that it was caused to break by the sinking or settling of the ground beneath it, which settling resulted from the unusual and long-continued saturation of the earth beneath the pipe by the flood waters which had covered it for a period of approximately two weeks recently before the pipe broke, and there is no proof to the contrary.

It is true that H. S. Wright states that he saw the broken pipe when defendant's employees made the excavation on January 18th as before stated, and that it was "an old rusty pipe, and it was flaky, just like any old rusty pipe," and that Buist Wehrenberger, who also saw the pipe at that time, states that it was "an old, scaly and rusty pipe;" but these two witnesses did not claim to have any experience or expert knowledge which would qualify them to testify with respect to the soundness or durability of the pipe in question, and they did not undertake to testify that it was unsound or defective, further than the statement that it had a "break" or "crack" in it, which was an undisputed fact.

It is also true that W. T. Carroll, chief plumbing inspector for the city of Nashville, and a practical plumber of twenty-four years experience, testified that, while putting in water connections for the city in 1914, it was necessary to uncover the defendant's gas main at the place here in question. We quote from the testimony of this witness as follows:

"Q. And what was its appearance even in 1914 with reference to age, just describe to the jury how it looked even at that time? A. Well, from the best I remember at that time they were just like all pipings that have been in the ground so long; it had a lot of rust and stuff caked around it, you couldn't tell just how long it had been there. Except it looked like it had rusted, of course, like ordinary pipes will do when they are in the ground, sometimes they rust and dirt and stuff stick to it.

"Q. What effect does rust have on a pipe, corrosion? A. Well, of course, rust when they have too much of it, it eats them up."

On the other hand, there is testimony by witnesses qualified by education and long experience to speak on the subject, that an appearance of rust on the outside of a cast-iron pipe that had been buried in the earth for a considerable time was no indication that the pipe was unsound or defective. On this point we quote an excerpt from the testimony of S. E. Linton (president and manager of defendant company) as follows:

"We have records of cast iron pipes having been in use in Paris, by the water company for two hundred and sixty-seven years, and still in use now. We have records of cast iron water pipes in Philadelphia in use a hundred and four years and still in use. I have those records there to substantiate that. The first gas company built in America was in Baltimore in 1820, built in Baltimore in 1820 and started to operate in the year 1830, and they have gas mains in use now that have been in use a hundred years in Baltimore and they still don't know how much longer they will last. They are still in use. There is no way of determining the life of a cast iron main. I have been in the business for forty years, very nearly, and I have never seen a cast iron main that was worn out or that was replaced

because it was worn out. It cannot wear out. There is a little crust of rust that forms on the outside of a cast iron pipe, kind of crystallizes there, and that is all there is to it.

"Q. And that formation of rust or scale on the outside of the cast iron pipe serves as a protection or armor against further encroaching rusts or erosion? A. It seems to, because there has been no evidence of rust penetrating, but just on the surface.

"Q. What effect does the passage of gas through the inside of the pipe or main have on the pipe? A. We have no evidence of any deterioration on the inside of the pipe, because all gas has a certain oily or light carbon property in it that seems to give it a coating on the inside. protective coating.

"Q. Then it does not disintegrate from the inside? A. No, sir."

C. F. Carter (defendant's chief engineer) also testified on this subject, as follows:

"Q. Mr. Carter, which type of pipe is the most durable that is known for the conveying of gas through the highways and streets? A. There is no question about cast iron being what is termed permanent material. We have steel pipe, but it is not certainly in the class with cast iron when it comes to durability.

"Q. Cast iron, as to cost, is more expensive than steel pipe or wrought iron pipe, isn't it? A. Yes, sir.

"Q. And more durable? A. Yes, sir.

"Q. What is the thickness of that six inch main on Fourth Avenue South? A. It is approximately half an inch.

"Q. Now, Mr. Carter, a pipe of that kind laid in the ground two feet or more below the surface of the street, the street covered over with brick and concrete, as you observed it, in its permanent form on Fourth Avenue South, at this time, what is the effect of the surrounding soil on that pipe, on the outside of the pipe? A. Well, there is a downward trend, a downward pressure, as a rule that forms on the pipe as it goes down, there is a pressure downward.

"Q. What I am getting at is this, the action on the surface of the pipe? A. The corrosion action?

"Q. Yes, sir? A. There is corrosion that takes place in any material and that corrosion continues. where it tends to take off that material. It is purely characteristic of cast iron, on which it forms a coating around the outside of the cast iron which is impervious to the corrosive action. Now, that is not true in the case of other materials. In other words, as we know it in our business, and always has been known, why cast iron pipe, after the corrosion, in time forms that impervious layer, that is it cannot penetrate or get to the iron, but forms that layer and it does not deteriorate.

"Q. In other words, as I understand you, the effect of that formation of scale, or corrosive scale about the outside of the pipe

is that it surrounds the pipe and prevents the further encroachment of the atmospheric or other conditions, or water condition on the pipe outside? A. It does.

"Q. In other words, it is a protection to the pipe? A. Yes, sir.

"Q. Now, as to the inside of the pipe, what is the action of gas passing through the pipe, and what effect does that have on it? A. The action of the gas is this, we have oils and oily vapors in our gas and they form on the inside of the pipe a coating which is also impervious to deterioration of the pipe.

"Q. Now, then the oily coating on the inside what is the tendency of that as to preventing rust or degeneration on the inside of the pipe? A. Well, it acts just like paint, just as paint will protect wood or iron either.

"Q. Then, that oily substance on the inside protects the inside of the pipe and the scale on the outside protects the outside of the pipe? A. True.

"Q. And those conditions tend to prolong the life of the pipe? A. They do."

Defendant had no record of the age of the main in question, but defendant's witness, Boston Porterfield, testified that he helped lay it thirty-five or forty years before the trial below (1932), which was thirty or thirty-five years before plaintiff was injured.

Harry Lester, sanitary inspector of the health department of the city of Nashville in January, 1927, and for about four years theretofore, testified, as a witness for defendant, that he inspected the filling station in question about 8:30 o'clock in the morning of January 18, 1927 (which was before any representatives of defendant reached the station), and he detected a foul odor that "smelled like sewer gas" to him. He stated that he was familiar with the odor of illuminating gas and the odor of sewer gas.

This witness testified further that the flood waters caused the sewers to "disgorge and regurgitate their contents out on the surface of the water;" that "the water comes up out of the man-holes and settles there;" that "after the water went down in the bottom" there was "a lot of complaint down there about bad odors from all over the bottom and everywhere around when (where) the water was up."

On cross-examination, Mr. Lester testified that he spent about an hour at the filling station on the occasion of his visit above mentioned; that the station building and premises were "clean" and he saw no sewage in or about the premises and saw no evidence of sewage coming into the station through the toilet; that he did not smell any sewer gas there then that was of sufficient strength to asphyxiate anybody; that the odor he smelled in the station was "an odor like the whole Black Bottom smelled" and it was just as strong out in the street as it was in the filling station.

Dr. J. M. Breckinridge, chemist and head of the chemical department of Vanderbilt University since 1919, testified for defendant, in response to hypothetical questions, that, under such flood conditions as those described in the record, the water would back up into the sewers and cause the contents of the sewers to be flushed out into the streets and into the neighborhood and into the residences above ordinary high water, and "the solid material would settle anywhere it had the opportunity as the waters drifted away," and that, the "putrid and decaying matter" in the contents of the sewers forms hydrogen sulphide, or sewer gas, which is a "poisonous" gas.

Dr. Breckinridge testified further that a stove burning ordinary bituminous coal in a very close room would, "if the draught was cut off or if the air from the outside was blowing back," generate carbon monoxide, an odorless and very poisonous gas, which affects the blood rather than the respiratory system.

Dr. Breckinridge also testified that, during the flood conditions described, the brick walls of the station office would tend to absorb "gaseous solutions" in the water containing sewage, and when the flood waters disappeared and the office was heated by the coal stove, the "sewer gas would gradually come out as the water evaporated." The substance of Dr. Breckinridge's evidence in chief on this subject is contained in an excerpt from his testimony as follows:

"Q. Now, Doctor, assume as stated, the walls of the office were saturated, and stood for some weeks in a state of saturation with sewage water and surface water, what would be the effect with the burning condition in this room after the waters had receded in drying out these walls? A. The carbon monoxide is very slightly soluble in water, if such a hydrogen sulphide is soluble in water to the extent of about three-twenty-three volumes per hundred volumes of water. As this water would disappear and as the temperature would rise the walls would dry out and the hydrogen sulphide which was soluble in the water would then come from the water and penetrate wherever it had an opportunity to go.

"Q. Now, supposing that these sewage contents from this closet in the office, as well as from the sewer under the office, assume there was an old sewer, and these high waters having precipitated all of its contents and substance on this office wall and saturated the brick, there would be a rather slow process of drying out? A. With that type of heating it would be a fairly slow process.

"Q. A fairly slow process? A. Yes, sir.

"Q. Now, then, assume that those walls on January 1st were submerged to the extent of four feet plus the water that had been on the surface for a long time, for several weeks, containing the sewer contents and the washings from in and about the surrounding territory of these walls, they having received this water inside and

out, would the brick tend to absorb the contents of that water and its solutions, gaseous solutions? A. I am not sure of the type of brick, but I would say the average brick will do that thing.

"Q. Now, you say sulphureted hydrogen and sewer gas is soluble in water? A. To the extent of three hundred and twenty-three volumes in one hundred volumes of water.

"Q. Then it would become absorbed in the water, as when th^ water was above four feet, and as it receded its contents in the walls would precipitate the sewer gas in solution would it, on the wall? A. The sewer gas would gradually come out as the water evaporated.

"Q. And as long as there is any water in those walls that was the result of a flooding of the sewer and its contents, so long would there be sewer gas or sulphureted hydrogen in confinement in those walls, is that correct? A. Yes, sir.

"Q. How about a concrete floor and the concrete walls and concrete pavement? A. Well, that would depend entirely, if you are referring to the ground underneath, any sulphur bearing material. either plants or animals, on decomposing will produce hydrogen sulphide. Now, that hydrogen sulphide might get into a pocket and might find its way somehow or other into the building.

"Q. Now, suppose there was an old sewer, or a sewer running generally under this office, would that tend to emit sulphureted hydrogen in the atmosphere in and about that office?

"Mr. Walker: Have you any proof of that?

"Mr. Price: Yes, I will prove it.

"A. I didn't get your question.

"Q. Assuming that there was an abandoned sewer or an old sewer. and you precipitate the contents of such old sewer into this building, under it or in close proximity, would that have a tendency to emit sulphureted hydrogen under pressure of the high water running into this Filling Station and in that vicinity? A. Sewage under almost any conditions will produce hydrogen sulphide, and whether I am answering your question or not, I cannot quite get it.

"Q. Now Doctor, would the sewage water rising to the extent of four feet above this office, as stated to you, what would be the result on the toilet inside here as to disturbing its contents? A. The material, as the water was going down, at first the toilet would be flushed, but as the water trickled away then the sewage would gradually go down. but depending upon the rate at which it was going down would determine whether or not that toilet would flush any.

"Q. Now, with the rising water above the sewage system and forcing the water out of the sewer and its contents in that neighborhood, what would be the effect on this toilet as to making it disgorge sewer contents in those premises? A. Well, the contents

and soluble material from the sewage would no doubt settle as the water passed out, it would settle on the floors, on the walls or just any place it had an opportunity.

"Q. Would it cause this toilet to disgorge its contents like other sewerage connections? A. Yes, that is on the rise of the water.

"Q. On the rising of the water? A. Yes, sir.

"Q. Now, Doctor, assuming that there had been cleaning processes whereby the office was swept out, washed out or cleaned out, but having been saturated with these sewage contents, would that still leave, notwithstanding that cleaning and washing on the floors and around the walls, would that still leave that sewage matter or sewage gas in the walls that had not yet evaporated? A. Yes, sir, and in addition to that the moment you begin to stir water which is saturated with hydrogen sulphide the hydrogen sulphide comes out of its own accord."

On this subject, Dr. E. M. Sanders, was asked, and answered, questions as follows:

"Q. Suppose this, that the rise in the water, the unprecedented season of storm and flood had been such as to force the water from the sewers in that neighborhood to regurgitate and expel the sewer contents all over the neighborhood so that the water that stood around those walls and around this place in general would have carried the sewage contents with it, and assume further that sulphide of hydrogen, very soluble in the water and the gas, and that when this stove was lighted and these walls were warmed up, having been thoroughly saturated, would or not that condition of itself have been enough to expel or release sewage gas into that place? A. If the sewage had not been exposed to light and air out in the water before it was saturated in the wall of course it would give off the odor of sewage.

"Q. Sewer gas is poison also? A. If it is confined and the percentage of the gas high, it is.

"Q. Well, it asphyxiates and knocks out, as you say in common language, just as does carbon monoxide from illuminating gas or a coal stove or any other noxious gas, carbon monoxide has the same effect on the patient, doesn't it? A. I think the so called damp in the mines and wells and sewers is more deadly than carbon monoxide.

"Q. Well, the damp that you say comes from sewers is more deadly than carbon monoxide? A. Yes, sir.

"Q. Have you had a case of sewage asphyxiation? A. No, sir, I never saw one."

It is in proof that if a gas pipe is in proper condition and is properly laid, it is not "the usual thing for it to leak gas." It also appears from the testimony of S. E. Linton, defendant's president and manager, that "the undermining and settling by water with (of)

the soil beneath the pipe" is one of the known causes of a "break" in the gas main.

Aside from evidence with respect to defendant's inspection of its gas mains (which evidence will be mentioned later), we have stated, in substance, the principal facts disclosed by the proof in the record.

We are of the opinion that there was ample evidence from which the jury could find that plaintiff was asphyxiated by illuminating gas that escaped from defendant's main and traveled along the channel of the service water pipe, through the water meter and the water cut-off, into the stock room of the filling station.

It is argued for defendant that, upon the evidence in the record, it cannot be found that plaintiff was asphyxiated by gas from defendant's main rather than by sewer gas, except by "basing an inference upon an inference," and that this is not permissible. The rule which defendant thus seeks to invoke is sound and well settled. East Tennessee & W. N. C. Railroad Co. v. Lindamood, 111 Tenn., 457, 472, 78 S. W., 99; Louisville & N. Railroad Co. v. Jackson, 3 Tenn. App., 463, 471.

However, a fact may be proved by circumstantial evidence, and from the fact thus proved another fact may be inferred, without contravening the rule that an inference cannot be based upon an inference. Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn. App., 170, 178.

Defendant also seeks to invoke the well-recognized rule that the jury should not be permitted to determine the cause of the plaintiff's injuries by guess or conjecture, where there are two equally probable causes of the injury, and the defendant is responsible for only one of these causes. But this rule does not contemplate that the proof shall exclude the possibility that the injury might have resulted from a cause other than that alleged by the plaintiff. Such "possibility" is not to be allowed to defeat a recovery, where the evidence discloses sufficient facts and circumstances surrounding the occurrence to justify a reasonable juror in concluding that the thing charged was the prime cause (Nashville Railway & Light Co. v. Harrison, 5 Tenn. App., 22, 35, and authorities there cited); and such, in our opinion, is the state of the evidence in the instant case. (It should be observed that what we have just said refers to the physical thing which injured plaintiff, without reference to the question of negligence.)

With respect to the alleged negligence of the defendant in permitting gas to escape from its main, the learned trial judge took the view that the doctrine of res ipsa loquitur applied, and he charged the jury accordingly; but his honor also charged the jury as follows:

"As a means of distribution, I charge you that there is no evi-

dence to show that the defendant's gas main which broke was improperly laid in Fourth Avenue; and you should therefore draw no inference of negligence from the manner in which it was laid in the street, or from its age, since there is no evidence that the length of time it had been in service proximately caused the injury complained of in this case."

We agree with the trial judge in his view of the evidence as stated in the above-quoted excerpt from his charge to the jury. Moreover, we see no occasion to extend this opinion by a statement of our reasons for holding that it was proper to thus instruct the jury, for we do not think the plaintiff is in a position to question the correctness of the instruction quoted above. At the conclusion of the principal charge, and before the jury retired to consider of its verdict, the court said:

"Anything further?" whereupon plaintiff's attorney said: "The plaintiff is satisfied."

This statement of counsel was an express acquiescence in the entire charge, and was, in effect, a concession that there was no evidence that defendant's gas main was improperly laid in Fourth avenue, and no evidence that the length of time said main had been in service proximately caused the injury complained of in this case, and that there was no basis in the evidence for an inference of negligence from the manner in which the main was laid in the street or from its age. McColgan v. Langford, 6 Lea, 108, 117; Hayes v. Cheatham, 6 Lea, 1, 7; Malone v. Searight, 8 Lea, 91, 94; Hamilton v. Carter, 14 Tenn. App. 337, 340; 2 R. C. L., p. 238, par. 198.

One who has deliberately taken a position in the course of a litigation without mistake induced by the opposite party must act consistently therewith throughout the litigation. Stamper v. Venable, 117 Tenn., 557, 561, 97 S. W., 812; Rutzler v. Bond, 165 Tenn., 160, 161, 53 S. W. (2d), 376.

In the appellate court, a party is confined to the theory upon which the case was tried with his approval below. 2 R. C. L., pp. 69 and 79.

We also concur in the views entertained by the learned trial judge, as disclosed by his charge to the jury, that the uncontradicted evidence shows that the gas manufactured, sold, and distributed by defendant (known as illuminating gas, but principally used in recent years for heating and cooking purposes) is poisonous; that, although it is poisonous, defendant's gas is recognized as a public necessity, and the defendant is engaged in a legal business to meet the requirements of the public and is not an insurer against injuries inflicted by its gas, but, owing to the dangerous character of illuminating gas when not properly confined, the law imposes upon the defendant a high degree of care in the distribution of its gas—not the highest degree of care that can be conceived of, but

a degree of care that is practicable, and is commensurate with the dangers that may reasonably be expected to occur from its improper or negligent distribution.

We think the rules stated in the last foregoing paragraph are supported by the authorities. See Annotation on the subject of "Liability of gas company for injury or damage by escaping gas," in 25 A. L. R. at page 262 et seq.

After the trial court had thus charged the general rules of law prescribing the degree of care the defendant owed to the plaintiff, and had instructed the jury that there was no evidence that defendant's gas main was improperly laid in Fourth avenue or that the length of time it had been in service proximately caused plaintiff's injury, and that, therefore, the jury should draw no inference of negligence from the manner in which the main was laid in the street or from its age, the court then further instructed the jury as follows:

"The undisputed evidence shows that there was a break in the main of the defendant in Fourth Avenue near the gasoline station where the plaintiff worked, and that illuminating gas escaped. On this point I charge you that if it appears that the gas main was in the exclusive management and control of the defendant, Gas Company, and that the breaking of such main is a thing that does not happen, or does not usually happen in the ordinary course where due care is exercised by those in charge of it, there is a legal inference that such break is the result of the failure to exercise the degree of care required, and in the absence of any explanation or countervailing evidence, would be sufficient to warrant a verdict in favor of the plaintiff.

"I charge you, however, that the break in the gas main is not an inference of negligence that is compelling, but furnishes only circumstantial evidence of the fact in the absence of direct evidence. In other words, this inference of negligence, or as it is sometimes called, 'prima facie presumption' of negligence, is to be considered by the jury in so far as it is of value or without value in arriving at the truth. To be more explicit, as I have heretofore stated, that in the absence of countervailing evidence, or evidence explanatory which rebuts the presumption or tends to rebut the inference, the inference is sufficient to warrant a verdict in favor of the plaintiff. But if there is credible evidence showing that the break in the main was due to some cause or causes over which the defendant had no control, or that it was not proximately caused by defendant's failure to perform its legal duty, then the inference or prima facie presumption disappears, and your verdict on that point should be in favor of the defendant.

"The legal inference above defined and explained, and which is drawn from proven facts, does not cast upon the Defendant Gas Company the burden of proving that it was free from negligence.

The burden as from the beginning continues to rest upon the plaintiff, who must show by the preponderance of all the evidence that his injury was proximately caused by the failure of the defendant to exercise the degree of care required as defined and explained by the Court, before he can recover.

"If you should find from the preponderance of all the evidence that for some eight or ten days prior to plaintiff's injuries there was a rise in the Cumberland River, and the water stood from six to ten feet over defendant's gas main in Fourth Avenue and the Filling Station where plaintiff worked, that there was a break in the gas main near the Filling Station, and the gas entered said Filling Station along certain water pipes on the day plaintiff was injured, and that he was overcome as a proximate result of such gas, and that while unconscious he fell to the floor and fractured his skull; and if the preponderance of the evidence further shows that the defendant failed to exercise the high degree of care which the law requires to prevent the escape of gas from its mains, then the defendant would be liable, and you should find in favor of the plaintiff.

"Now, in determining whether or not the defendant exercised such care or failed to do so, to prevent the escape of gas, the test is, did its agents and servants exercise that care which men of practical experience and engineering skill in the distribution of illuminating gas exercise to prevent the escape of such gas.

"The mere fact that there was an injury does not create a presumption that there was negligence or failure to exercise such care as proximately caused the injury. If the preponderance of all the evidence shows a failure to exercise such care, and the plaintiff's injury was a proximate result thereof, then the defendant would be liable.

"On the contrary, if such care was exercised, or if the evidence is in equipoise as to whether it was or was not, you should find in favor of the defendant.

"In this connection I charge you that the law did not impose upon the defendant the duty of making open excavations in Fourth Avenue to determine whether or not there was a break in its gas main in the absence of any notice or complaint that gas was escaping. If you should find from the evidence that at the time the defendant's gas main in Fourth Avenue was under water there was the usual flow of gas through the main to customers and there was no complaint of any diminution of the supply of gas during the high water or after the water had receded, then the defendant had a right to infer that its gas main was in serviceable condition. If, however, you should find from the preponderance of the evidence that the water standing in the street is calculated to affect gas mains; that men of practical experience and skill in the distribu-

tion of gas recognize such a condition as likely to cause a break or leak in such mains, then it was the duty of the defendant to use active diligence after the waters receded to ascertain if such mains were in a serviceable condition, or whether or not gas was escaping.

"However, if the proof shows that after the water had receded the defendant's agents and servants made certain well recognized tests to determine if water was in the mains, and whether or not there was a leakage of gas, and found none, and if there was found the usual and customary flow of gas through said mains, and no leakage, as aforesaid, then its duty as to inspection was complied with."

The above-quoted excerpt from the charge contains a clear statement of the rule res ipsa loquitur; but it is insisted for defendant that, upon an application of the principles thus enunciated by the learned trial judge to certain undisputed facts in evidence, the defendant was entitled to a directed verdict in its favor. It is said, in support of this contention, that it appears from undisputed testimony of reputable and unimpeached witnesses that immediately after the flood waters receded, and before plaintiff's accident, defendant, through its agents and servants, made all reasonable inspections and tests commensurate with the degree of care due from it under the circumstances, in order to ascertain and determine whether there was a leakage of gas from its mains, and found none.

If the learned trial judge took the view of the evidence just stated, his action in declining to direct a verdict for defendant would seem to be explainable only on the theory that he was of the opinion that no case to which the doctrine of res ipsa loquitur applies should be withdrawn from the jury; and such is the rule in some jurisdictions. But in an Annotation found in 66 A. L. R., page 1532 et seq., on the subject of "Direction of verdict: effect of explanatory or qualifying testimony to nullify prima facie case made by plaintiff," the annotator states the "majority rule" (at page 1536 of 66 A. L. R.), as follows:

"By the great weight of authority, although the plaintiff has met the burden resting upon him by making a prima facie case, so that when he rests, if the defendant offers no evidence, the plaintiff is entitled to the direction of a verdict, or, at least, the submission of the case to the jury, yet the defendant, by explanatory or qualifying evidence of uncontradicted and credible witnesses, may so nullify the evidence upon which the plaintiff's case depends that it no longer constitutes a prima facie case. In these circumstances the defendant is entitled to the direction of a verdict."

For support of the statement just quoted, the annotator cites cases from the federal courts and from the courts of sixteen states.

Other cases supporting the rule stated in the above-quoted Annotation, but not cited therein, are as follows: Ryder v. Kinsey, 62

Minn., 85, 64 N. W., 94, 34 L. R. A., 557, 54 Am. St. Rep., 623, 627; Judson v. Bee Hive Automobile Service Co., 136 Or., 1, 294 P., 588, 297 P., 1050, 74 A. L. R., 944, 949; Lawson v. Mobile Electric Co., 204 Ala., 318, 85 So., 257; Smith v. Railway Co., 3 N. D., 17, 53 N. W., 173; Scarpelli v. Washington Water Power Co., 63 Wash., 18, 114 P., 870, 875; Stott v. Power Co., 47 Cal. App., 242, 190 P., 478, 479.

In 45 C. J., pp. 1224, 1225, it is said:

"The application of the doctrine (res ipsa loquitur) does not affect the general rule that, where the evidence is so clear and convincing that reasonable minds would not differ in their conclusions therefrom, the question of defendant's negligence is for the Court and not for the jury, and hence, if defendant's explanation establishes the absence of culpable negligence so clearly as to leave no substantial conflict in the testimony or issuable fact for the jury to pass on, the presumption will be overcome as a matter of law, and if submitted to the jury will authorize the setting aside of a verdict for plaintiff. However, plaintiff is not precluded from offering evidence in rebuttal of defendant's evidence, but, on the contrary, if a satisfactory explanation is offered, plaintiff must show its insufficiency or other non-applicable features or introduce other evidence to sustain the charge if he would prevent the Court from granting a non-suit or directing a verdict against him."

In North Memphis Savings Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 188, 196 S. W., 492, 498, the court said:

"The office of the rule res ipsa loquitur is, in the main, *to determine whether, on the state of facts shown, the case should go to the jury.* If the court is of the opinion that the res proven furnishes some basis for an inference of negligence on the part of the defendant, *nothing else appearing* he should pass the case to the jury and that body may or may not make the inference as its judgment may dictate." (Italics ours.)

In this state, from an early day, the doctrine of res ipsa loquitur has been applied to cases of fire communicated by sparks emitted from railway locomotives (Burke v. L. & N. Railroad Co., 7 Heisk., 451, 19 Am. Rep., 618; Louisville & N. Railway Co. v. Manchester Mills, 88 Tenn., 653, 660, 14 S. W., 314); and in the case of Carolina, C. & O. Railway Co. v. Lumber Co., 130 Tenn., 354, 362, 170 S. W., 591, it was held that the railway company had successfully carried the burden of proving affirmatively that the two locomotives there involved were properly constructed, and were equipped with spark arresters and other appliances of the latest and most approved character to prevent the emission of fire, all in good repair, and properly and skillfully operated, and that, upon the issue of negligence in the equipment and operation of the engines, the railway company

was entitled to a peremptory instruction in its favor at the close of all the evidence.

It seems obvious that, in the instant case, as it comes to this court, it must be held that the "break" in defendant's gas main was not due to negligence of the defendant, as there is ample evidence that it was caused by the vis major—the unprecedented flood—and all other suggested and reasonably possible causes were eliminated by the trial judge, with the consent of the plaintiff, as heretofore pointed out.

But "a duty devolves upon Gas Companies to inspect their pipes and mains and the connections therewith. It must use reasonable care in making these inspections; and if a leak could have been discovered and prevented by such an inspection, that fact of itself will be sufficient to charge the Company with negligence, if it fail to make the inspection." 3 Willis'-Thornton's Law of Oil & Gas, sec. 1093, p. 1492.

However, we are of the opinion that if it appears from undisputed testimony of reputable and unimpeached witnesses that immediately after the flood waters receded, and before plaintiff's accident, defendant, through its agents and servants, made all reasonable inspections and tests commensurate with the degree of care due from it under the circumstances, in order to ascertain and determine whether there was a leakage of gas from its mains, and found none, "it is not only the prerogative of the Court but a solemn duty" to direct a verdict for the defendant. Hopkins v. Railroad, 96 Tenn., 409, 458, 34 S. W., 1029, 32 L. R. A., 354.

As we have seen, the trial court charged the jury that the law did not impose upon the defendant the duty of making open excavations in Fourth avenue to determine whether or not there was a break in its gas main, in the absence of any notice that gas was escaping, and further, that if the proof shows that after the water had receded the defendant's agents and servants made certain well-recognized tests to determine if water was in the mains, and whether or not there was a leakage of gas, and found none, and if there was found the usual and customary flow of gas through said mains, and no leakage, as aforesaid, then its duty as to inspection was complied with.

Notwithstanding the foregoing charge, with which plaintiff was "satisfied" when it was delivered, it is now insisted for plaintiff that defendant is liable because it "did not take precautions against this occurrence which should have been expected, but negligently omitted to take any precautions by properly inspecting its mains during the period of one week between the recession of the high waters and the plaintiff's injury."

It appears from undisputed proof that one of defendant's experienced employees made a "standard drip test" at the lowest

point in Fourth avenue (about 200 feet from the filling station) after the flood waters subsided and before January 15th and found no evidences of a break in the main. If the break which was subsequently discovered near the filling station had occurred before the waters receded, the aforesaid "drip test" would have disclosed it.

There was but one other "test" (for locating a break in a gas main) used by defendant and other gas companies in 1927, viz., the "bar test" which we have hereinbefore described. The bar test was ordinarily used to determine the location of a break in the main after it had been discovered that gas was escaping, and was not used as a precautionary method of inspection before there was any reason to suspect the existence of a "break" in any particular locality, for the reason that it would necessitate the drilling of many holes an inch and a quarter in diameter through the paving of the city's streets, as by this method escaping gas may sometimes be "smelled" a considerable distance from the break and at other times and places may not be smelled through such "spile hole" drilled within a few feet of the break—the result depending upon the direction in which the gas (which follows the way of "least re-istance") may be traveling.

When it is remembered that approximately 12 miles of defendant's mains were submerged by the "high waters" and defendant had no more reason to anticipate a break in its main near the filling station in question than at any other point in the overflowed area, we think that all reasonable men will agree that it would have been unreasonable to require the defendant to resort to the bar test throughout the 12 miles of its overflowed mains. No break in defendant's mains resulted from the flood of 1926-1927, other than the one involved in this case.

 The duty of inspection does not require a constant inspection to be kept up all along the lines of the company by such methods as the bar test, in the absence of some reason to suspect the existence of a leak or escape of gas.

It appears, without dispute, that as soon as the flood waters went down, the defendant placed a crew of men in the area that had been flooded, to re-establish service, and "line walkers" to "constantly walk the mains," and all of these men, together with defendant's meter readers, were charged with the duty of watching at all times for any indications of escaping gas, and there is no evidence that any of them neglected their duty in that respect. There was no occasion for any of these employees of the defendant, in the discharge of their duty, to go into the filling station where plaintiff was employed, as there was no gas service of any kind therein, and there is no evidence that the smell of illuminating gas was perceptible in the street prior to plaintiff's accident. There is no evi-

dence that defendant's gas invaded the filling station until January 15th—the day on which plaintiff was asphyxiated—and the only reasonable inference that can be drawn from the whole proof is that the break in the main occurred at that time. The main at that point and in that vicinity had never leaked before January 15, 1927, and has never leaked since it was repaired on January 18, 1927, about five years before the trial of this case below.

The case has been a difficult one to decide. It is of the kind sometimes characterized as a "border-line case." We have been aided by unusually able briefs of counsel for the parties, respectively, who have cited a multitude of authorities, which we have endeavored to examine, but we have not found it expedient, in the time at our command, to review them in this written opinion. Many of them are digested in the Annotations to which we have referred.

Upon the whole record, we have reached the conclusion that the defendant successfully carried the burden of establishing its freedom from negligence by uncontradicted testimony of credible witnesses, and was entitled to a directed verdict. The first, second, and eighth assignments of error are, therefore, sustained.

On behalf of plaintiff, it is said that certain specified assignments of error in this case, including those which we have just sustained, are insufficient, in that no references to the pages of the record are cited in support thereof as required by the rules of this court. The statement of the case, assignments of error, brief, and written argument for defendant are all in the same printed document, and that part of this document devoted to the statement of the case, brief, and argument contains citations to the pages of the record upon which defendant relies for support of its several assignments of error. This is a sufficient compliance with the rules to justify consideration of the assignments. Wallace v. Goodlett, 104 Tenn., 670, 678, 58 S. W., 343; Stricklin v. L. & N. R. Co., 2 Tenn. App., 141, 148; Cobble v. International Agricultural Corporation, 2 Tenn. App., 356, 362; Pigg v. Houston & Liggett, 8 Tenn. App., 613, 620.

The defendant's sixth assignment of error is that the trial court erred in not holding that the verdict is so excessive as to show or evidence passion, prejudice, or caprice on the part of the jury.

The remaining assignments not disposed of either assert error in the charge of the court to the jury or in the action of the trial court in refusing to charge certain special requests for instructions on behalf of defendant.

In view of our holding that the court should have directed a verdict for defendant, the sixth assignment, supra, and all of the assignments subsequent to the eighth are now immaterial, and their consideration will be pretermitted.

It results that, for the errors pointed out by the first, second, and eighth assignments, the judgment of the circuit court is reversed, the verdict of the jury is set aside, and plaintiff's suit is dismissed, and judgment will be entered accordingly.

The costs accrued in the circuit court will be adjudged against the plaintiff, Grady Phillips, and the surety on his cost bond. The costs of the appeal will be adjudged against plaintiff, Grady Phillips.

Crownover and DeWitt, JJ., concur.