John M. GROSS and Wayne Adair, Plaintiffs–Appellants,

v.

NASHVILLE GAS COMPANY, Defendant–Appellee.

Court of Appeals of Tennessee, Middle Section.

May 29, 1980.

Certiorari Denied by Supreme Court Sept. 15, 1980.

John C. Tune and John M. Popham, IV, Tune, Entrekin & White, Nashville, for plaintiffs–appellants.

Douglas Fisher and Mary Martin Schaffner, Howell & Fisher, Nashville, for defendant–appellee.

J. Anthony Farmer, Hogin, Farmer, Guyton & Swann, Knoxville, for Tennessee Trial Lawyers Ass'n, amicus curiae.

## OPINION

DROWOTA, Judge.

In this appeal from an adverse judgment in a personal injury action, plaintiffs–appellants John M. Gross and Wayne Adair challenge the trial court's decisions on the admissibility of certain evidence and on certain jury instructions and urge this Court to judicially adopt the doctrine of comparative negligence for the State of Tennessee.

Appellants filed suit in this case to recover damages for injuries sustained when a fire broke out in a manhole where they were working as employees of South Central Bell Telephone Company, splicing a telephone cable with an acetylene torch. Appellants contended the fire resulted from the combustion of natural gas which had leaked into the manhole. Appellants sued appellee Nashville Gas Company for $50,-000.00 compensatory damages for John M. Gross and $150,000.00 compensatory damages for Wayne Adair. Prior to trial of this case, appellants amended their complaint, claiming compensatory damages of $65,-000.00 for Gross and $275,000.00 for Adair, and claiming in addition $250,000.00 punitive damages against appellee.

The substance of appellants' complaint as amended was that the appellee, which maintains and operates a system of underground gas lines below the City of Nashville, was negligent in maintaining its underground gas distribution system in such a manner that gas leaked into the manhole in which the appellants were working and caused the fire which injured them. Specifically, the complaint as amended charged that the appellee was negligent in failing to regularly inspect its gas lines; in failing to utilize the most reliable and effective method and equipment for locating gas leaks in its lines; in failing to replace corroded gas lines which it knew or should have known were corroded to the point of leaking; in failing to subscribe to safety standards and codes; and in failing to maintain its lines in such a manner that natural gas could escape from its lines into places where people could or could be expected to congregate. Appellants further alleged that maintenance and storage of gas below the City of Nashville was an ultrahazardous activity and that therefore the appellee was strictly liable for failing to properly safeguard against the escape of gas from its underground pipe system; that the natural gas which injured the appellants was an instrumentality under the exclusive management and control of the appellee and that the event which injured the appellants was such that in the ordinary course of events it would not have happened if the appellee had used proper care; that appellants' injuries were a direct and proximate result of the appellee's acts and omissions; and that the acts of negligence enumerated in the complaint as amended constituted gross and wanton negligence, entitling appellants to punitive as well as compensatory damages.

Appellee in its answer to appellants' amended complaint denied all liability and as additional defenses asserted that appellants were guilty of negligence which was proximate, gross and contributory in that they failed to follow safety precautions, with which they were familiar, regarding work in manholes; that a proximate cause of the accident was the failure or refusal of South Central Bell Telephone Company to supervise appellants properly; that by the above acts and omissions, appellants and South Central Bell had assumed the risk of injury; and that from appellee's standpoint, appellants' injuries resulted from a misadventure or unavoidable accident.

Based upon the defenses regarding South Central Bell's responsibility for the injuries, and also based upon South Central Bell's notification of the gas company regarding its subrogation interest arising because of worker's compensation payments it, as a self insured company, had made to appellants, appellee filed motions to join South Central Bell as an involuntary plaintiff. These motions were denied.

A jury trial was held in the Sixth Circuit Court of Davidson County on January 2–5 and 8–12, 1979. The trial court directed a verdict in favor of appellee on the issue of punitive damages. The jury found both appellee and appellants negligent and on this basis returned a verdict in favor of appellee. Judgment was entered on the verdict and the cause dismissed.

Appellants' motion for a new trial was denied, but their motion to file an amended complaint including the theory of comparative negligence was granted.

In their appeal to this Court appellants present eight issues for review. Two of these have to do with the trial court's rulings on the admissibility of certain evidence; appellants assert that the trial court erred in admitting into evidence certain safety practices or standards of South Central Bell and that it erred in refusing to admit certain photographs of exposed high pressure gas lines belonging to appellee. Appellants also argue that the trial court was in error in failing to charge the jury with five of their special requests for jury instruction, namely, those dealing with remote contributory negligence, strict liability, the duty of care required of a gas company, gross negligence, and punitive damages. Finally, appellants argue that Tennessee, through this Court, should judicially adopt the doctrine of comparative negligence.

## FACTS

In November of 1975, John Gross and Wayne Adair were employed as cable splicers by South Central Bell Telephone Company. Gross had worked for the telephone company approximately seven years and Adair six years. As part of their job, both men had received training in South Central Bell safety practices for working in manholes.

On Monday, November 10, 1975, Gross and Adair were scheduled to work the midnight to 8:00 a. m. shift. They had been working this same shift for much of the preceding week, during which time their task had been to splice an underground telephone cable at the intersection of Randy Road and "old" Old Hickory Boulevard in Madison, Tennessee. After reporting at midnight on November 10 to the telephone company's Ambrose Avenue work center to pick up their truck, tools and equipment, Gross and Adair proceeded to the work location, arriving at about 1:00 a. m. Gross drove his own vehicle to the location.

Before entering the manhole where they were doing their work, Adair tested for combustible gas by dropping the hose of the company's "explosive meter" or "sniffer" into the manhole, siphoning air through the hose with an aspirator bulb, and taking a meter reading. No combustible gas was detected. Approximately one foot of water standing in the floor of the hole was pumped out, leaving one or two inches of water on the floor. Adair then dropped a large "blower hose" which was connected to a power blower or fan into the manhole, and Gross and Adair entered the hole. Neither Adair nor Gross could later remember how the hose was positioned in the manhole

nor which of them had positioned it, but both thought that it must have been properly angled toward the side of the manhole rather than hanging straight down, because otherwise it would have been hard for them to do their work.

A duct on the west wall of the manhole was unplugged when the men entered the hole, and Gross unplugged or "gouged" another duct in the east wall with a pair of scissors, to relieve water pressure building up behind the duct, he said. Neither Adair nor Gross tested for the presence of gas at the duct entrances, nor did they test at all for gas in the manhole after entering it. A plastic sheet was hung from the manhole roof to prevent water from dripping on the cable splice; Adair admitted that this sheet "could interfere with the flow of air."

Gross began working on the cable in the north wall of the manhole, unsealing its lead sleeve with an acetylene torch. Although South Central Bell requires its employees to obtain a "torch slip," or written authorization to use an acetylene torch, from a supervisor prior to using one in a manhole, neither Gross nor Adair had obtained one that night, explaining later that although there was a supervisor they could have called, their regular supervisor was out of town. Gross unsealed the sleeve in about 15 to 20 minutes and extinguished the torch. After about an hour and a half to two hours, the men completed the "cable throw,' which is presumably a part of the cable splicing operation, and prepared to reseal the sleeve. Gross then reignited the acetylene torch and began "reaming up the sleeve" with solder. Because it had started to rain, Adair pulled a canvas tent across the manhole entrance, but he did not set it up on its frame, with flaps rolled up, as was required by South Central Bell safety standards.

After twenty or thirty minutes, at about 4:15 a. m., when the seam was almost completed, Gross "though [he] smelled something," asked Adair "if he smelled anything," and asked him to reposition the blower hose. Adair stood up "and about that time the hole caught on fire." According to Adair, it "was over in a split second."

Gross and Adair climbed out of the manhole and had a nearby resident call the police, who sent for an ambulance. The men were taken to the hospital where they were treated for severe burns to the upper portions of their bodies.

Shortly after the accident, J. B. Givens, a construction supervisor for South Central Bell, was notified of the fire in the Randy Road manhole. Proceeding to the accident scene, Givens picked up Chester Martin, a cable splicer working with a crew at another location. Givens left Martin at the scene to guard the manhole and went to Memorial Hospital where he spoke with Gross and Adair.

According to Givens, Gross asked him to have someone drive his truck from the manhole to his home. He told Givens that just before the fire he had smelled "prestolite," or acetylene gas. When Givens asked Gross whether the ducts had been plugged, Gross replied that all but one, the one he had opened to relieve water pressure, had been plugged. Gross also asked Givens if he could give him a "torch slip," to which Givens replied that it was too late for that. Givens believed the fire was caused by natural gas, despite Gross's comments regarding "prestolite."

C. D. Read, district manager of construction for South Central Bell, was notified of the accident at about 6:00 a. m. He notified G. B. Ferguson, safety supervisor for the telephone company, and the two men went together to the accident scene. They observed the tent unsupported by a frame, the plastic sheet, and the unplugged ducts referred to above, and proceeded to test the atmosphere in the manhole. They did not find an explosive gas mixture in the manhole proper with the blower hose properly positioned, but did detect an ignitable mixture of gas in the unplugged duct in the west wall of the manhole. Before leaving the scene, Read left instructions with telephone company employees to seal all ducts and finish resealing the sleeve. This work was completed at about 2:30 the afternoon of November 10.

Willis O. Winters, construction foreman for the Nashville Gas Company, arrived at the Randy Road manhole while telephone company personnel were still conducting tests. He was joined by B. D. Hale, construction supervisor for the gas company, and J. B. Hulsey, construction foreman. Winters, Hale and Hulsey conducted tests for combustible gas in the manhole and in the west duct and came up with results similar to those of Read and Ferguson from the telephone company. The odorant added to natural gas was smelled at the duct entrance. After the ducts were sealed, further tests were conducted; during a three hour period, the gas in the manhole, with the ducts plugged, increased from zero to 4.5 per cent. The gas company considers a 5% mixture to be combustible.

The next day, Winters, Hale and Hulsey conducted an investigation in the area and found another manhole which upon testing showed a 40% gas mixture. A nearby telephone conduit revealed a similar mixture. Further investigation led to the discovery of a leak in the one–inch service line to 656–58 Old Hickory Boulevard. Winters later testified that the distance from the leak, which was west of the Randy Road manhole, to the manhole was approximately 1750 feet. When the pipe, originally laid in 1954, was dug up, it was discovered that it was corroded and was leaking. It appeared to Winters and Hulsey, from the amount of dried dirt surrounding the pipe, that it had been leaking for three or four days. Although the gas company had no record of having worked on this section of pipe before, a stainless steel "Adams" clamp was found on the pipe over a corrosion hole. Winters testified that it was unusual for the company not to have a record of a clamp put on by the company; that the rubber under the clamp they found was not of the type the gas company uses; that, had the gas company put the clamp on, it would have first rewrapped the pipe with a special yellow wrap, which had not been done; and that he, Hale and Hulsey had concluded, from the presence of a telephone cable which had been laid under the gas line, that the original coating of the pipe had been knocked off and the clamp placed on the pipe during the laying of a telephone conduit, believed to have occurred in 1966.

The leak was temporarily repaired and by the next day all readings of the ducts and the area were negative for combustible gas. The Adams clamp was at some point lost and was never presented at trial, although the leaking pipe section was produced.

As has been indicated, both appellants, Adair to a greater degree, suffered severe burns as a result of the accident in the manhole. Both men incurred large hospital and medical bills and both missed work for some time. Adair was in the hospital for 95 days and missed 355 days of work; he also retained a functional disability of approximately twenty per cent total permanent disability of each hand and of ten to fifteen per cent total body disability. Gross suffered no permanent disability.

To prove the negligence of the appellee gas company, appellants introduced much testimony and evidence regarding safety precautions taken, or not taken, by appellee in the operation and maintenance of its underground gas distribution system. Appellants contend that the testimony of their expert witness, Dr. John Wikswo, along with that of Winters, Hulsey and Hale from the gas company, and the introduction of certain interrogatories to appellee, established certain facts at trial "as to the overall operation and maintenance of [appellee's entire] gas distribution system."

Appellants showed that appellee had no safety officer or organized safety department at the time of the accident. Appellee does not controvert this fact, but insists that it has, and had at the time of the accident, a "leak prevention program" which includes leak surveys, corrosion control, periodic replacement and upgrading of pipe, and the addition and maintenance of odorant in its gas at well above the level required by the state and federal governments. Testimony was introduced on all these facets of the program.

Regarding leak surveys, appellee points out that although governmental regulations

require annual surveys only in principal business districts, all other areas requiring surveys only every five years, appellee had extended its leak survey program to include an annual survey of the entire area. In the Old Hickory Boulevard area, a survey had been done some five months before the accident. Appellee does its own surveys in principal business districts, but contracts with the Southern Cross Corporation of Atlanta to do other surveys, and it was this corporation that did the 1975 survey of the Old Hickory Boulevard area.

Appellants have asserted that the leak survey, or detection, methods used by appellee are not the most effective and reliable available. Appellee does, according to Mr. Winters, use the better "backpack type flame ionization units" in surveys of principal business districts, testing even inside buildings with them. Appellee does not contest the fact that the general method used by Southern Cross for leak surveys in other areas is that called a "vegetation survey," a method which is effective only for areas where there is vegetation, and appellee does not dispute that the area of the accident was mainly paved over. However, appellee, through the testimony of Winters, has stated that Southern Cross is instructed to use other means of detection in areas where vegetation growth is sparse, including flame ionization units, one of the methods cited by appellants as being effective and reliable. There was no evidence that a flame ionization unit had been used in the Old Hickory Boulevard area, however.

Appellants assert that appellee "made no positive efforts to determine when construction might be done in areas where its pipes were laid." Proof was introduced that appellee indeed has no one who was assigned to check building permits issued by the Metropolitan Government of Davidson County. Instead, appellee relies on contractors to notify it, through an on–call system, that they will be digging in and around the lines. Appellee does have a self–imposed requirement of conducting a flame pack survey of all gas lines in construction areas of which it is aware. It also participated in the drafting of a bill for introduction in the state legislature requiring contractors to notify the gas company before beginning excavation.

As surveys are done, all leaks which are found are listed by street address and noted on maps prepared by the surveyors and kept by appellee. Appellants have asserted that appellee's service data system regarding leaks was not maintained in a manner which would enable it to determine easily "that a certain area was having corrosion problems or that pipes in that area were reaching the end of their service life." Appellants further assert that the appellee had no long–range preventive maintenance replacement program for its pipes. Appellee's witness Winters admitted that there was no written document setting out such plans, and that appellee had no plans at the time of the accident to replace the lines laid in 1954 in the Old Hickory–Neelys Bend area where the accident took place. There had been some thirty–two leaks in the service lines within a one mile area of the accident during the years 1973, 1974 and 1975; twenty–two of these were corrosion leaks. Overall, during that same period, the entire system had 3,076 leaks.

Appellee did not dispute the facts as alleged by appellants as to the number of leaks, but essentially contends that it has a good safety record by pointing out that it has approximately 1350 to 1360 miles of gas main, servicing 67 to 68,000 customers; that the last fire or explosion caused by gas in Davidson County before the 1975 accident at issue here was in 1964; that less than two per cent of its gas was "unaccounted for" in 1975; and that such "unaccounted for" gas includes "gas lost through breakage of lines during building construction, etc., gas used to purge air from new lines, and temperature–compressed gas metered through at artificially lowered volumes as well as gas lost through leakage." Appellants calculated the unaccounted for gas percentage in 1975 to be 4.3 per cent.

Regarding maintenance of pipes, appellee did not dispute appellants' assertion that it "obtained no soil information data [availa-

ble free of cost] from outside agencies and [that] when new facilities were designed the soil was not tested [for corrosivity] before pipes were laid." Appellee does point out that it does have programs for the prevention of pipe corrosion and for the periodic replacement and upgrading of pipes, the schedule for which is modified by reports of the cumulative number of reported leaks. Appellee has some cast iron pipes still in use, and now puts in plastic or steel pipes. For the steel pipes, appellee has a system of "cathodic protection," which means that when leaks are detected, current is run through the pipes to stop the corrosion, or oxidation, process. Appellee's witness Mr. Winters asserted at trial that theoretically, pipes continuously treated with cathodic protection should last indefinitely although in an answer to an interrogatory, appellee stated only that such pipes had an estimated life of in excess of 25 years. Appellee also wraps its pipes and requests all excavators to notify it when they expose gas lines so that pipes can be inspected and rewrapped. According to Winters, appellee's pipes are thicker than required by government regulations and well under pressure limitations set out by the government agencies. Cast iron mains are surveyed after sub–freezing weather, high and medium pressure valves six inches or larger are inspected annually and smaller valves at least once every five years.

Appellee did not dispute that, within fourteen days of the accident, it had repaired a corrosion leak ten street numbers down from the service line involved in this case, or that, seven days prior to the accident, it had repaired another corrosion leak in the same area, nor did it attempt to show that any effort was made to conduct an investigation of the area as a whole as a result of these leaks.

Appellants at trial introduced certain industry publications with which appellee's employee witnesses were not familiar, but Winters indicated that appellee's employees are provided with a yearly publication which provides compiled updates on governmental regulations, and that employees are otherwise kept informed of what the regulations require through periodic training sessions. Appellee has asserted and appellants do not dispute that appellants made no showing that appellee has been guilty of violating any state or federal governmental safety requirements.

As has been indicated, appellee maintains odorant levels well above the required minimum level set by the government. The government requires a level detectable by an ordinary person at one–fifth of its lower explosive or flammable limit, or at one per cent (⅕ of 5%). On November 10, 1975, tests at the Randy Road manhole indicated the company's odorant was readily detectable at one–fifth of one per cent, indicating a level higher than the required one per cent level. Also, in freezing weather, the gas company increases the amount of odorant added to its natural gas to assure an adequate detection level.

Appellee introduced evidence of South Central Bell's safety rules and practices and their training programs, through the testimony of various South Central supervisors. The evidence produced by this testimony was that the safety rules and practices of South Central Bell required the issuance of a torch slip by a supervisor before one used a torch in a manhole, that a torch was not to be used in a manhole with ducts unplugged, that the blower hose was to be positioned in the hole with two ninety degree bends in it, that gas was to be retested for every hour when using a torch in a manhole, and that when using a tent over a manhole the collapsable frame was to be used and the flaps rolled up to assure proper ventilation.

Appellants admitted having knowledge of these rules and regulations and being trained with regard to them. Both men had attended several training sessions, Gross within the thirty days preceding the accident. Both knew the reasons for the safety rules, i. e. that they existed to protect the workers from the hazards incident to the type work they did. Adair specifically admitted that he knew the dangers he was risking by not obtaining a torch slip.

The torch slip used by South Central Bell had written on it the hourly testing requirement. Appellants admitted that they violated the rules requiring the torch slip, the hourly retesting for gas, the use of a tent only with a frame, and the plugging of ducts. However, they stated that they had asked for duct plugs at the work center before going to the Randy Road manhole on November 10, 1975, but never received any. They also stated that they did not remember how the blower hose had been positioned.

However, both appellants, and several other cable splicers who testified in their behalf, all stated that the required practices were not customarily followed, that torch slips were seldom gotten, that they had worked in manholes before with unplugged ducts, and that they had been taught and led to believe by some of the training demonstrations that as long as the blower was running and the manhole had been tested for gas, there could be no fire or explosion in a manhole.

## I

■ Let us first consider the issue of whether the trial court erred in admitting into evidence the South Central Bell safety practices or rules to which we have hereinabove referred. Appellants argue that these rules were not properly admitted because "under present Tennessee law safety codes or standards not having the force of law, or not promulgated by anyone authorized by law to make such regulations, are not admissible into evidence."

Appellants cite Paine, Tennessee Law of Evidence, § 44, p. 42 (1974); *Long v. Tomlin,* 22 Tenn.App. 607, 125 S.W.2d 171 (1938); and 58 A.L.R.3d 154 (1974) in support of their argument. Paine does state that the general rule excludes such rules "*to establish the standard of care* expected of [a] defendant" (emphasis added), unless a governmental entity gives them the force of law. The *Long* case likewise excluded certain safety rules, sought to be introduced by a defendant in a personal injury action on the issue of the plaintiffs' contributory negligence, since they "were not law, and were not promulgated by anyone authorized by law to make such regulations." *Long, supra* at 180, 125 S.W.2d 171. It was not indicated in *Long* whether the plaintiffs there were aware of the rules at issue, and the defendant had apparently made no attempt to show they were aware of them.

The writer of the annotation at 58 A.L. R.3d 148 (1974), entitled "Admissibility in Evidence, on Issue of Negligence, of Codes or Standards of Safety Issued or Sponsored by Governmental Body or by Voluntary Association," states that:

While at one time it appeared that one could identify a majority rule that safety codes or standards promulgated by governmental or private authorities and lacking the force of law were not admissible in evidence on the issue of negligence, the modern trend towards greater admissibility of these codes and standards has apparently been great enough to make it unwise to attempt to identify any majority rule or minority rule.

58 A.L.R.3d 154. The writer goes on to note that a rationale for admissibility is that such codes "are objective standards representing a consensus of opinion ...," and that a rationale for inadmissibility is that "such codes and standards have no compulsive force and represent merely the opinion of their authors, not delivered under oath and not subject to cross–examination." *Id.* Continuing, the writer recognizes:

In several cases where courts have held admissible safety codes or standards lacking the force of law, they have emphasized that such codes or standards do not conclusively determine the applicable standard of care, but are merely one kind of evidence to help the jury determine the issue of reasonable care.

*Id.* It is also noted that some courts holding rules inadmissible have emphasized that the codes were published subsequent to the alleged negligence involved in the litigation, suggesting that awareness of the rules on the part of the party against whom they are introduced is a relevant factor. *Id.* at 155.

In this case, the rules in question were not introduced to establish the standard of care expected of the appellants as to their own safety, but were introduced merely as some evidence, or as a circumstance, relevant to the issue of appellants' own contributory negligence. The appellants admitted knowledge of the rules which were introduced and of the reasons for them, and acknowledged having been trained in regard to them. As we have indicated, they also testified that the rules, or some of them, were not customarily followed, and that if a negative reading for gas was obtained before entering and if the blower hose was working, a manhole was safe to work in. The jury was rightly given the benefit of all this evidence in order that they might reach their own conclusion on the issue of the appellants' own possible contributory negligence.

As the trial court stated in its charge to the jury:

Now, the mere existence of a safety rule doesn't mean it's negligent to violate a safety rule. It may be considered by you in determining whether or not such a violation would be a negligent act or an act that a reasonably prudent person wouldn't do under the circumstances. So the existence of safety rules don't necessarily change the standard of care that one would employ at the particular time. They may be considered as suggestions, as part of the background circumstances, but you would not find that the mere violation would be negligence in and of itself unless it also amounted to a lack of care under the circumstances.

There is Tennessee case law to support the conclusion that where one is aware of rules or regulations, such rules are admissible under the theory that one's conduct might have been, or should have been, influenced by them. In *Epstein, Henning and Company v. Nashville, Chattanooga & St. Louis Railway*, 4 Tenn.App. 412 (1926), plaintiff sued the defendant–railroad for damages resulting from the railroad's failure to notify plaintiff–consignor of his consignee's refusal to accept delivery of a shipment of goods. The Chancellor concluded that the railroad was under a duty of due diligence to inform the consignor of the refusal, distinguishing the contrary holding of an earlier case on the basis, in part, of the existence of a rule of the American Railroad Association, Freight Claims Division, requiring member railroads to give notice to the consignor of freight that was refused or unclaimed. The Court of Appeals did not agree with the Chancellor's holding that the existence of the American Railroad Association rule rendered the holding of the prior case inapplicable: "These rules were prescribed by the carriers for the government of their employees, *and there is no evidence that the complainant had any knowledge of their existence*; hence his conduct could not have been in any way influenced by them." (emphasis added) *Epstein, supra* at 420. The court continued, quoting from a Minnesota case, as follows:

"Private rules of a master regulating the conduct of his servants in the management of his own business, although designed for the protection of others, stand on an entirely different footing from statutes and municipal ordinances designed for the protection of the public. The latter, as far as they go, fix the standard of duty toward those whom they were intended to protect, and a violation of them is negligence in law per se. But a person cannot, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common. Such rules may require more, or they may require less, than the law requires; and whether a certain course of conduct is negligent, or the exercise of reasonable care, must be determined by the standard fixed by law, without regard to any private rules of the party.

"Under some circumstances, such rules may become an important factor in the application of legal principles to the conduct of a person; as, for example, *where the rule was known to him,* and he governed, or had a right to govern, his conduct accordingly. Such was the case of *Smithson v. Chicago Great Western*, 71

Minn. 216, 73 N.W. 853. In that case the rule was known to, and obligatory upon, both the party injured and the party guilty of the alleged negligent act. Each was bound to know that the other might and could regulate his own conduct on the assumption that he would obey the rule. . . ."

(emphasis added) *Id.* at 420–421.

█ We find the above reasoning to be applicable to rules adopted for the protection of employees themselves, such as in the case here, even though here, concededly, the defendant, who was not the employer, had no knowledge of the rules in question. Such reasoning is in keeping with the fundamental legal principle that a person who knows or should know of a danger is under a duty to be more careful than one who lacks such knowledge. *See Restatement (Second) of Torts,* § 289(b) (1965); Prosser, *Law of Torts* § 32 at 161 (4th ed. 1971). "It is not, as has been sometimes suggested, a question of being required to exercise a higher degree of care than ordinary care, but rather one where ordinary care requires more than is usually the case due to the difference in the circumstances." *Ledford v. Southeastern Motor Truck Lines,* 29 Tenn.App. 675, 200 S.W.2d 981, 984 (1946). This principle of course holds true whether or not the defendant who created the primary danger knew of the superior knowledge of the injured plaintiff.

We find that the rules at issue here, being known to the appellants, were properly admitted as a circumstance relevant to the issue of whether appellants exercised proper care for their own safety or whether they were indeed guilty of contributory negligence in regard to their injuries.

## II

We shall next consider the other evidentiary issue presented in this appeal, i. e., in appellants' words, whether the trial court erred "in refusing to admit into evidence certain photographs of exposed high pressure gas lines belonging to the [appellee] because the proposed evidence was relevant and material as well as probative in value."

The photographs at issue are, again in appellants' words, "of high pressure lines and gas meters belonging to the [appellee], around the Nashville area, in places where persons and/or vehicles had a right and could be expected to be, which were above ground and not protected by any type of barriers." Appellants argue that the photographs should have been admitted, as they were material to the issue of whether appellee was grossly negligent in the "overall operation and maintenance" of its entire gas distribution system: according to appellants, "these pictures were merely one piece of a jigsaw puzzle that [they] feel would spell out the words 'gross negligence' after all the evidence was presented regarding the conduct and operation of [appellee's] business, which gross negligence was the cause of the particular accident with which this case is concerned."

The trial court ruled that "matters of safety in connection with meter installations and pressure reducers has nothing to do with leaking gas pipes through corrosion and are too remote to permit the inquiry into the safety of such practices in this particular case."

█ Whether a photograph is relevant and material, or instructive to the jury upon a material issue, is a determination for the trial court, and the admission or rejection of a photograph on such a basis is a matter which rests largely in the discretion of the trial judge. *Strickland Transport Co. v. Douglas,* 37 Tenn.App. 421, 264 S.W.2d 233, 239 (1953); *Plunkett v. Tice,* 55 Tenn. App. 255, 262, 399 S.W.2d 328 (1965); 32 C.J.S., Evidence, § 716 at 1018–1019.

█ We cannot say that the trial court abused its discretion in this case in excluding the photographs in question. Appellants in their complaint alleged that appellee was negligent, and grossly negligent, in "maintaining its *underground* gas distribution system in such a manner that gas leaked into the manhole in which the plaintiffs were working." (emphasis added) Even though appellants may have introduced evidence at trial which they believed

was material to the larger issue of how appellee operated its *entire* system, it appears to us that all this evidence was as well relevant and material to the narrower issue as presented in appellants' complaint, i. e. appellee's maintenance of its *underground* system, and that the trial was in fact limited to this narrower issue. The broader issue was thus not a question in controversy, and the photographs, relevant as they were only on this broader issue, were thus not material to a question in controversy. See *Jones v. Sands*, 41 Tenn. App. 1, 292 S.W.2d 492, 497 (1936). It follows that the trial court was not in error in excluding the photographs.

### III

As has been stated, appellants have asserted that the trial court erred in failing to charge the jury as to five of their special requests for instructions. The first of these requests involves the issue of remote contributory negligence.

After instructing the jury on the law of negligence, proximate cause, assumption of risk, contributory negligence and other legal doctrines applicable to the facts of this case, the trial judge gave the charge on remote contributory negligence expressly suggested by the Tennessee Supreme Court in *Street v. Calvert*, 541 S.W.2d 576, 585 (Tenn.1976):

[R]emote contributory negligence is negligence that's too far removed either as to time, place or causative force to be a proximate cause of an injury. If you find the plaintiffs guilty of that type of remote contributory negligence, then in the determination of their damages, you must reduce the amount of the verdict you would otherwise award them in accordance with their own contribution to their own injuries, considering each plaintiff separately in that regard.

At the jury's request, the court subsequently clarified portions of its charge. The court's clarification included further instruction on the law of proximate and remote contributory negligence:

If you find contributory negligence, then you have the question was it a proximate cause or was it a remote cause of the injuries? The proximate cause is that which in a natural and continuous sequence unbroken by any new cause produces the injury either by itself or together with other negligence. There can be more than one proximate cause. The other definition, negligence that is a substantial factor in producing or failing to prevent the injury. Then you would find for the defendant.

If you find it was too remote, negligence existed but is too remote to be a proximate cause, too unconnected in causative force for you to call it a proximate cause, then there would not be a defense, but you would reduce the verdict you would otherwise give the plaintiffs in accordance with their contribution to their own injury, the remote negligence.

Appellants' requested charge is entitled "All Concurring or Negligent Acts are not Proximate Cause" and reads as follows:

An event or act, in this case, the use of the torch by the plaintiffs, may be an act or event without which a particular injury would not have occurred, but if it was merely the condition or occasion affording opportunity for other events, in this case, the leaking gas of the Nashville Gas Company, if you believe the plaintiffs' theory of this case, to produce the injury, it is not the "proximate" cause thereof. (citing 173 S.W.2d 714, *Western Union Telegraph v. Dickson.*)

We find the trial court's instructions to be correct and sufficient. Appellants' requested instruction is not legally incorrect insofar as it goes, but we find it to be factually misleading, in that it implies that the only act of the appellants that might be construed as being contributorily negligent was their "use of the torch." Appellee introduced evidence that the appellants were arguably contributorily negligent in the use of the torch *without* authorization, *without* plugging all ducts in the manhole, *without* testing hourly for gas, *without* proper ventilation in that a tent frame was not used

with the tent which was placed over the manhole cover and in that a plastic sheet was hung from the manhole roof, *without* the blower hose properly positioned (although this was a controverted fact), and *with* awareness of the dangers of their work, and of the *increased* danger due to their failure to take the above listed safety precautions. The trial court was not in error in refusing to charge the jury as to the appellants' requested charge relating to remote contributory negligence, and covered the applicable law most adequately in the charge it did give.

## IV

■ Appellants allege that the trial court "erred in failing to charge the jury as to the doctrine of strict liability in tort because there was evidence at trial sufficient to support such a charge."

We have considered all of appellants' arguments in regard to the issue of strict liability. These arguments center mainly around the requisite elements of proof in a case of strict (product) liability in tort. Appellants state that they were "unable to find any reported Tennessee decision applying or refusing to apply the doctrine of strict liability in tort to a distribution of natural gas because gas leaking from its pipes had caused injury to another."

Appellants have ignored language in two Tennessee cases to the effect that a gas company is not an insurer of safety to persons injured from escaping gas, but is liable only for failure to exercise the high degree of care commensurate with the danger of its product. *Evans v. Young,* 196 Tenn. 118, 264 S.W.2d 577, 583 (1954); *Nashville Gas & Heating Co. v. Phillips,* 17 Tenn.App. 648, 69 S.W.2d 914, 924 (1933). *See also* 26 Am.Jur.2d, Electricity, Gas, and Steam, § 195 at 406; and 96 A.L.R.2d 1017, 1084.

A rationale for this rule was stated by the court in *Phillips*: although gas is poisonous and thus dangerous, it is recognized as a public necessity, and, we might add, its dangers are known to the public. In the words of the renowned Prosser in his *Law of Torts,* "where ... the danger [of a prod-

uct's] use is generally known, it seems clear that the product cannot be regarded as unreasonably unsafe merely because it is capable of doing harm." Prosser, *supra,* § 99 at 660. *See also* Restatement Second of Torts, § 402A, comment K at 353–354.

The trial court committed no error in refusing to charge the jury in this case on the doctrine of strict liability, because the doctrine clearly does not apply to the present case.

## V

■ Appellants next challenge the trial court's failure to charge their special request on the duty of care required to be exercised by a gas company. Appellant's "agree with" the charge the court gave the jury on the standard of care, which included words to the effect that because of the nature of gas and its dangers, the company had a duty to exercise a "high degree of care." What they object to is "the lack of any statement or emphasis that this high degree of care is an affirmative duty and that, because of the highly dangerous nature of the Defendant's product, requires (sic) the exercise of every reasonable precaution to protect the public from injury."

We find that the trial court did not err in failing to charge the jury with appellants' requested instruction. We have examined the rather lengthy charge given by the trial court, and find that it was comprehensive, legally correct, as is conceded by appellants, and certainly adequate. Even were we to find the charge as given to be less than perfect, or the appellants' instruction to be more nearly perfect, which we do not, appellants were not entitled to a perfect charge—"a charge which states the law with substantial accuracy and fairly submits the issues to the jury should not be grounds for reversal." *Davis v. Wilson,* 522 S.W.2d 872, 884 (Tenn.App.1974).

## VI

■ The appellants have also contested the trial court's failure to charge the jury on gross negligence and on punitive dam-

ages. They insist that the facts show "such an entire want of care on the part of [appellee] 'as would raise a presumption of conscious indifference to consequences.'" *Citing Stagner v. Craig,* 159 Tenn. 511, 517, 19 S.W.2d 234 (1929).

Appellants especially emphasize the fact that, at the time of the accident, appellee had no safety officer or department; that no soil corrosivity information was obtained by appellee prior to laying pipes; that appellee had a poor service data system in that it "maintained no graphs or maps or other records to enable it to readily determine that a certain area was having corrosion problems or that pipes were reaching the end of their service life;" that appellee had no written " long range maintenance plan" for its pipes; that appellee used unreliable leak inspection methods; that there were leaks in the area of the accident shortly before the accident occurred, demonstrating "the inadequacy of the [appellee's] corrosion control program; that appellee failed to subscribe to certain industry publications; that appellee didn't check building permits issued by the city to determine when excavation might take place which might harm its pipes; and conclude that appellee was "operating a horse and buggy operation in the jet age."

Appellee asserts that it did use such "reasonable" care as is "practicable" and commensurate with reasonably foreseeable danger, *citing Phillips, supra,* and that it was not guilty of gross negligence. Appellee emphasizes that appellants "failed to produce any evidence that [appellee] failed to meet any governmental regulation or . . . any industry custom or practice;" that it did regularly inspect its gas lines and that its methods were adequate; that it routinely wrapped its pipes to prevent corrosion "hot spots;" and that its pipes "were sometimes dug up and/or damaged without permission or knowledge of the gas company.

We find that, although the acts or omissions listed by appellants might well have constituted negligence, that they do not constitute gross negligence in that they do not evidence "such entire want of care as would raise a presumption of conscious indifference to consequences," or a "heedless and reckless disregard for another's rights," or "utter unconcern for the safety of others." *Cole v. Woods,* 548 S.W.2d 640, 641–642 (Tenn.1977); *Inter–City Trucking Co. v. Daniels,* 181 Tenn. 126, 129–130, 178 S.W.2d 756, 757 (1944); *Odum v. Haynes,* 494 S.W.2d 795, 807 (Tenn.App.1972); *Fontaine v. Mason Dixon Freight Lines,* 49 Tenn. App. 598, 357 S.W.2d 631, 634 (1961); *Stagner, supra.* The measures appellee showed it did take certainly show *some* care, concern and regard for the safety of others.

More specifically, we further find, in accordance with Tennessee law on the subject, that, although appellants may have shown that appellee failed to maintain its underground pipe system in the safest possible manner under all the circumstances and that appellee was thus negligent in the operation of the system, that such failure in itself does not constitute gross negligence, especially in view of the fact that appellee apparently violated no governmental regulations. *See Odum, supra,* 494 S.W. at 806–807.

The trial court did not err in refusing to charge the jury in this case on gross negligence.

Because there was no evidence presented that would justify a charge to the jury on gross negligence, or on any of the other "essential ingredients to an award of punitive damages," it follows that the trial court was also correct in refusing to charge the jury on punitive damages. *See Inland Container Corporation v. March,* 529 S.W.2d 43, 45 (Tenn.1975).

( VII )

Appellants finally encourage us to judicially adopt the doctrine of comparative negligence for the State of Tennessee. They have been joined in their excellent arguments by the Tennessee Trial Lawyers Association as amicus curiae. It is urged that adoption of the doctrine will reduce confusion in the trial courts of this state and do away with the injustice–or "uneven justice"–inherent in the present system,

which often denies a chance for any recovery at all to a deserving plaintiff because of harsh, outdated and over–technical rules of law.

Appellee has forcefully argued against adoption of the doctrine, asserting that there is no detriment to the public interest in maintaining the "settled rule" of contributory negligence, with the exceptions which have been developed in Tennessee. Appellee further argues that, should the decision to adopt the comparative negligence doctrine be considered a desirable one, it is a decision which should be made by the legislature rather than the courts, in order that whatever rule is developed be a logical and comprehensive one, applicable to a variety of situations and problems not necessarily presented in this case.

This Court finds merit in the appellants' arguments that some form of comparative negligence represents the better law for these times, and would favor the adoption of the new rule in one of its forms–by either the Supreme Court of this state or by the legislature. We express no preference for which of the various forms of the rule be adopted, and leave that decision up to whatever body decides to address the problem. Again, we urge serious consideration of the change in the law as argued by appellants, but do not believe we are the proper body to address the issue.

In conclusion, the trial court not being in error on any of the charged issues, we affirm the judgment of that court.

Affirmed.

TODD, J., concurs in a separate opinion.

LEWIS, J., concurs.

TODD, Judge, concurring.

I concur in the excellent opinion of my colleague, Judge Drowota, in all respects except the final statement that "This Court ... would favor the adoption of the new rule (comparative negligence) in one of its forms ...."

I agree with Judge Drowota that this Court is not the proper body to address the

issue. Therefore, this Court should not attempt to express an informal, gratuitous opinion upon the issue.